# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 30, 2014

Lyle W. Cayce
Clerk

————

No. 13-10752

————

U.S. BANK NATIONAL ASSOCIATION, Litigation Trustee of the Idearc, Inc., et al, Litigation Trust,

Plaintiff – Appellant

v.

VERIZON COMMUNICATIONS, INCORPORATED; GTE CORPORATION; JOHN W. DIERCKSEN; VERIZON FINANCIAL SERVICES, L.L.C.,

Defendants – Appellees

————

Appeal from the United States District Court
for the Northern District of Texas

————

Before KING, HAYNES, and GRAVES, Circuit Judges.

KING and HAYNES, Circuit Judges:

Idearc, Inc. is a Delaware corporation that was spun-off from its parent corporation, Verizon Communications, Inc., in 2006. In March 2009, in the throes of the recession that began in 2008, Idearc filed for bankruptcy protection pursuant to Chapter 11. The confirmed plan of reorganization created a litigation trust to pursue, inter alia, Idearc's fraudulent transfer claims against Verizon and related parties. The Trustee, U.S. Bank National Association, filed this lawsuit against Verizon and two of its subsidiaries, GTE Corporation and Verizon Financial Services, L.L.C., and against former Idearc

No. 13-10752

director John W. Diercksen, alleging various federal and state law claims in connection with the spin-off.

The Trustee requested a jury trial, but the district court struck the jury demand and bifurcated the trial into two phases. For the first phase, the district court held a ten-day bench trial on a single fact issue: the value of Idearc following the spin-off transaction. The district court found that Idearc was solvent on the date of the spin-off, and it ordered the Trustee to show cause as to why the district court should not enter judgment against the Trustee on all of its remaining claims. After the parties submitted briefing, the district court issued its conclusions of law and entered judgment against the Trustee. The Trustee now appeals: the order striking the jury demand; evidentiary rulings before and during the trial; the findings of fact; the conclusions of law; and several pre-trial rulings on dispositive motions. For the following reasons, we AFFIRM the judgment of the district court.

## I.     Factual and Procedural Background

In 2005, the board of directors of Verizon Communications, Inc. ("Verizon") decided to spin-off Verizon's domestic print and electronic directories business into an independent company pursuant to 26 U.S.C. § 355. As a spin-off under § 355, the formation of the business would be tax-free to Verizon and its shareholders. To effectuate the spin-off, Verizon created Idearc, Inc. ("Idearc"), a Delaware corporation. Verizon chose John W. Diercksen, head of Verizon's strategic planning and former head of Bell Atlantic's yellow pages business, to lead the spin-off for Verizon and serve as the "pre-spin" director of Idearc.

On June 20, 2006, the certificate of incorporation for Idearc was filed, authorizing one hundred shares of common stock. The bylaws initially required that the corporation have a two-member board of directors and provided that those two members would constitute a quorum. Only Diercksen

2

was originally appointed to the board of directors. Diercksen appointed Kathy Harless, who had previously run Verizon's directory business, as President of Idearc. Diercksen then authorized Harless to issue one share of common stock and to sell that share to Verizon. Idearc continued basically as a shell corporation until the consummation of the spin-off.

Verizon hired JP Morgan and Bear Sterns to conduct due diligence on the directories business and develop the proposed capital structure. JP Morgan and Bear Sterns estimated that Idearc's initial value would be between $11.7 and $12.5 billion, and they recommended that the capital structure include $9.1 billion in debt, some of which was to be held by Verizon and some of which was to be publicly held. Comprehensive disclosures of the risks associated with Idearc post-spin-off were made in documents filed with the Securities and Exchange Commission and in the offering documents for the publicly-held debt. Those disclosures included risks associated with the tax sharing agreement with Verizon, which was imposed to protect the tax-free status of the spin-off.

The spin-off occurred on November 17, 2006. Under the terms of the spin-off, Idearc received Verizon's print and online domestic directory business. In exchange, Verizon received 145,851,861 shares of common stock to be distributed to Verizon stockholders, $7.115 billion in Idearc debt, and $2.5 billion in cash. Idearc incurred a total of $9.1 billion in debt, which included the debt issued to Verizon. This debt comprised: (1) a $1.515 billion secured Term Loan A; (2) a $4.75 billion secured loan ("Tranche B debt"); and (3) $2.85 billion in 8% Senior Notes due in 2016 ("Unsecured Notes"). Idearc also received commitments from financial institutions to lend it up to $250 million through a revolving credit facility. On the day of the spin-off, Idearc's stock, which was trading on the New York Stock Exchange ("NYSE"), closed at $26.25 per share.

No. 13-10752

Following the spin-off, Idearc was an independent, publicly traded company. It paid quarterly dividends of approximately $50 million in 2007 and the first quarter of 2008. Six months after the spin-off, Idearc's shares traded at a high of $37.66 per share. In October 2008, Idearc acquired another company by using cash from its ongoing operations. The corporation also made every interest payment on its debt through March 2009.

Idearc's business, heavily dependent on revenues from the sale of advertising, was adversely affected during the recession that began in 2008. In March 2009, Idearc filed for Chapter 11 bankruptcy. The Bankruptcy Code authorizes a plan of reorganization to "provide for . . . the retention and enforcement by the debtor, by the trustee, *or by a representative of the estate appointed for such purpose*, of any . . . claim or interest."[1] Pursuant to that authorization, Idearc's Plan of Reorganization (the "Plan"), confirmed in late December 2009, created a litigation trust (the "Litigation Trust") as the representative of Idearc to evaluate independently a variety of claims owned by Idearc, including claims against its officers and directors and fraudulent transfer claims against Verizon and its affiliates, and to pursue those claims thought promising for the benefit of holders of Idearc's unsecured claims. U.S. Bank National Association was appointed the trustee (the "Trustee") of the Litigation Trust.

On September 15, 2010, the Trustee filed this action in federal district court against Verizon; two of its subsidiaries, GTE Corporation ("GTE") and Verizon Financial Services, L.L.C. ("VFS"); and Idearc director John W.

---

[1] 11 U.S.C. § 1123(b)(3)(B) (emphasis added). Under § 1123, a plan may transfer legal claims to a litigation trust, even when the debtor remains in possession of all of its other assets. *Compton v. Anderson (In re MPF Holdings US LLC)*, 701 F.3d 449, 453 (5th Cir. 2012); *McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1335 (5th Cir. 1995). After a plan is confirmed by the bankruptcy court, a debtor will not have standing to bring claims that were transferred to a litigation trust. *In re MPF Holdings*, 701 F.3d at 454.

No. 13-10752

Diercksen (collectively, "Appellees"). According to the Trustee, Verizon created Idearc as a receptacle to place its "obsolete" directory, or "yellow pages," business and "load it up" with over $9 billion of Verizon's debt. According to Appellees, Idearc was a successful business that became insolvent during the 2008 financial crisis. The Trustee's second amended complaint contained a jury demand and eleven counts, summarized ever so briefly as follows: (1) & (2) fraudulent transfer against Verizon and VFS in connection with the spin-off; (3) breach of fiduciary duty against Diercksen; (4) aiding and abetting a breach of fiduciary duty against Verizon and VFS; (5) fraudulent transfer against Verizon and VFS in connection with a loan made by Idearc's subsidiary to Idearc; (6) fraudulent transfer against GTE and Verizon in connection with the "GTW distribution"; (7) fraudulent transfer against Verizon in connection with the interest payments subsequent to March 31, 2007; (8) unlawful dividend against Diercksen and Verizon; (9) promoter liability and breach of fiduciary duty; (10) unjust enrichment; and (11) alter ego.

On March 21, 2012, upon a motion by Appellees, for the reasons more fully discussed below, the district court struck the Trustee's jury demand. The Trustee moved to reconsider the order striking the jury demand, which the court denied. On September 17, 2012, the Trustee petitioned this court for a writ of mandamus, seeking review of the district court's orders striking the jury demand and denying the motion to reconsider. The motions panel denied the petition on September 27, 2012.

On July 31, 2012, the district court granted in part and denied in part Appellees' motion to dismiss the amended complaint. It dismissed in part Counts One and Two for fraudulent transfer with respect to the Unsecured Notes and Tranche B debt. The district court also dismissed Count Ten for unjust enrichment and Count Eleven for alter ego insofar as it alleged a stand-alone claim.

5

No. 13-10752

Less than a month later, the district court issued a trial management order that bifurcated the four-week trial into two phases. The order stated that following the first phase, the court would decide Idearc's value at the time it was spun-off from Verizon in November 2006. The district court planned to make any other necessary factual determinations during the second phase of the trial, which was left unscheduled at the time of the order.

On September 14, 2012, the district court ruled on three pending motions for summary judgment. Among other things, the court's order limited the Trustee's recovery on its breach of fiduciary duty claim against Diercksen (Count Three) to the available insurance unless the Trustee could show that Diercksen engaged in willful misconduct or gross neglect, and it entered partial summary judgment in Appellees' favor as to Counts One and Two for fraudulent transfer with respect to the $2.5 billion in cash paid to Verizon and Count Eight for unlawful dividend with respect to the cash.

From October 15 to 26, 2012, the district court conducted Phase I of the bench trial in order to resolve a single factual issue: the value of Idearc as of the date of the spin-off. On January 22, 2013, the district court issued a Memorandum of Decision containing its factual findings. After reviewing the testimony and exhibits, the district court found that the value of Idearc as of the spin-off date, November 17, 2006, was at least $12 billion. The same day that it issued its factual findings, the district court ordered the Trustee to file a brief explaining whether its remaining legal claims were viable in light of the valuation finding. The Trustee complied and submitted a brief arguing that almost all of its remaining claims were still viable.

On June 18, 2013, the district court issued its conclusions of law, holding that, based on its factfinding on Idearc's value as of November 2006, none of the Trustee's remaining claims could be maintained. The district court held that Phase II of the trial was no longer necessary, and it entered judgment in

Appellees' favor. The Trustee timely appealed the following: the order granting the motion to strike the jury; the evidentiary rulings before and during the bench trial; the factual findings following the bench trial; almost all of the district court's conclusions of law following the bench trial; aspects of the district court's order dismissing some of the Trustee's claims; and aspects of its order granting partial summary judgment for Appellees.

## II.     Right to a Jury Trial

The Trustee appeals the district court's order striking the jury demand, claiming that it was entitled to a jury trial under the Seventh Amendment. The district court held that the Trustee's constitutional right to a jury trial was extinguished because the resolution of its fraudulent transfer claims was part of the equitable claims-allowance process. We agree with the district court.

### A. Applicable Law

Whether a party is entitled to a jury trial is a legal question that is reviewed de novo. *Provident Life & Accident Ins. Co. v. Sharpless*, 364 F.3d 634, 639 (5th Cir. 2004).

The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend VII. The Amendment's reference to "Suits at common law" denotes suits brought to determine legal rights, as opposed to equitable rights. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989). To determine whether a claim is legal or equitable, courts first compare the action in question to those actions of the Eighteenth Century that were brought in the courts of law and equity, and, second, consider whether the remedy sought is legal or equitable in nature. *Id.* at 42. The second prong is generally considered the more significant of the two. *Id.* Typically, actions to recover preferential or fraudulent transfers are considered suits at common law and are eligible for a jury trial under the Seventh Amendment. *Id.* at 48.

However, the right to a jury trial on a fraudulent transfer claim may be extinguished in certain circumstances in the bankruptcy context. It is well-settled that "when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.'" *Id.* at 51 (quoting *Atlas Roofing Co., Inc. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 455 (1977)). Public rights include "seemingly 'private' right[s]" that are created by Congress, "acting for a valid legislative purpose pursuant to its constitutional powers under Article I, . . . that [are] so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." *Id.* at 54 (quotation marks and citation omitted). Bankruptcy is an example of an area involving "public rights," since Congress has

> [E]stablish[ed] uniform laws on the subject of bankruptcy, [which] convert[] the creditor's legal claim into an equitable claim to a pro rata share of the res. . . . As bankruptcy courts have summary jurisdiction to adjudicate controversies relating to property over which they have actual or constructive possession, and as the proceedings of bankruptcy courts are inherently proceedings in equity, there is no Seventh Amendment right to a jury trial for determination of objections to claims[.]

*Katchen v. Landy*, 382 U.S. 323, 336–37 (1966) (internal citations omitted); *see also N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982).

In *Granfinanciera*, the Supreme Court considered whether the public-rights doctrine transformed a fraudulent conveyance claim into an equitable claim when the claim had been brought by a debtor against a creditor. *See* 492 U.S. at 36–37, 51–55. The creditor-defendant requested a jury trial, but the bankruptcy court denied the motion and held a bench trial. *Id.* at 37. The Court held that a creditor triggers the process of "allowance and disallowance

of claims" when it files a claim against the bankruptcy estate, which in turn subjects the creditor to the equitable power of the bankruptcy court. *Id.* at 58–59 & 59 n.14 (citing *Katchen*, 382 U.S. at 336). Because the creditor-defendant in *Granfinanciera* had not submitted proofs of claim against the bankruptcy estate, the creditor had not subjected itself to the equitable power of the bankruptcy court and triggered the public-rights exception. *Id.* at 58. Therefore, the creditor-defendant was entitled to a jury trial. *Id.* at 58–59.

One year after *Granfinanciera,* the Supreme Court decided *Langenkamp v. Culp*, 498 U.S. 42 (1990) (per curiam). In *Langenkamp*, creditors submitted a claim against a bankruptcy estate, and the bankruptcy trustee later sued the creditors to recover preferential transfers. *See id.* at 42–43. The Court held that unlike *Granfinanciera*, the creditor-defendants were not entitled to a jury trial because the proof of claim and trustee's action became "integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's equity jurisdiction." *Id.* at 44 (citing *Granfinanciera*, 492 U.S. at 57–58).

More recently, *Stern v. Marshall*, --- U.S. ---, 131 S. Ct. 2594, 2617 (2011) reaffirmed *Langenkamp*. *Stern* clarified that "*Langenkamp* . . . explained . . . that a preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because then the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship." *Id.* But, in *Stern,* "there was never any reason to believe that the process of adjudicating [the creditor's] proof of claim would necessarily resolve [the debtor's] counterclaim." *Id.* Additionally, the debtor's counterclaim was "in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding." *Id.* at 2618. Thus, the Court held that Article III precluded the

bankruptcy court from finally resolving the state law counterclaim. *Id.* at 2618.

**B. Analysis**

At issue before us is whether a litigation trust for a bankruptcy estate has a right to a jury trial on a fraudulent transfer claim against a creditor when the creditor has filed a proof of claim in the bankruptcy proceedings and the bankruptcy court is required, before disposing of that claim, to determine whether, under 11 U.S.C. § 502(d), property of the creditor is recoverable as a fraudulent transfer. The district court held that the Trustee was not entitled to a jury trial under *Langenkamp* because the resolution of the debtor's fraudulent transfer claims against Verizon was integral to the resolution of Verizon's claims against the debtor and therefore integral to the restructuring of the debtor-creditor relationship. In order to determine whether *Langenkamp* applies to the present matter and extinguishes the Trustee's right to a jury, we must consider: (1) whether the creditor (here Verizon) has filed proofs of claim in the bankruptcy proceeding; (2) whether the proofs of claim have been resolved, and, if not, whether their resolution will necessarily require the resolution of the debtor's fraudulent transfer claims (asserted by the Trustee) against Verizon; (3) whether a debtor, as opposed to a creditor, is bound by *Langenkamp*; (4) whether a litigation trust, succeeding to the rights of the debtor, has a right to a jury trial when the debtor itself would have no such right; and (5) whether *Stern* requires a jury trial in this case. We address each issue in turn.

*1. Proofs of Claim*

Verizon filed four proofs of claim in the Idearc bankruptcy litigation: one on August 10, 2009 (No. 1779) (pre-petition breaches of contract), and three on December 31, 2009 (Nos. 2448, 2450, 2451) (contracts rejected under the Plan). ROA 21344, 21357. While the avoidance and recovery claims for fraudulent

transfers under §§ 544 and 550 of the Bankruptcy Code were transferred to the Litigation Trust simultaneously with the confirmation of the Plan, the claims-allowance process continued in the bankruptcy court as contemplated by the Plan.  On June 17, 2011, Idearc objected to all four proofs of claim under 11 U.S.C. §§ 105 and 502, and asserted that the claims should be disallowed until Verizon "has paid the amount, or turned over the property, for which it is liable, if any, under [§§] 544 and 550."[2]  ROA 21342, 21348, 21349, 21350.[3]

The Trustee argues that Idearc did not have the authority to object to the proofs of claim because Idearc filed its objection after the Plan had been confirmed, creating the Litigation Trust and transferring the right to pursue Idearc's §§ 544 and 550 claims against Verizon.  Even assuming that the Trustee is correct, and that Idearc lacked such authority, this is irrelevant in light of the way that § 502(d) is worded:

> [T]he [bankruptcy] court *shall* disallow any claim of any entity from which property is recoverable under section . . . 550 . . . of this title or that is a transferee of a transfer avoidable under section . . . 544 [or] . . . 548 of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 550 . . . of this title.

11 U.S.C. § 502(d) (emphasis added).   Verizon filed proofs of claim, and under the mandatory language of § 502(d), the bankruptcy court could not resolve those claims in favor of Verizon if Verizon had been the transferee of a fraudulent transfer.  At the time Idearc objected, the Trustee had already filed

---

[2] Sections 544 and 550 are the Bankruptcy Code's avoidance and recovery statutes, and the Trustee brought four claims under these sections in its amended complaint.  ROA 6093, 6094, 6096, 6098.

[3] Idearc had initially objected to all four of Verizon's claims on June 29, 2010, but on different grounds. *See In re Idearc Inc.*, No. 09-31828 (BJH) (Bankr. N.D. Tex. June 29, 2010) (Doc. 2173) (arguing the claims had been fully satisfied). On June 17, 2011, Idearc amended its objections to include its argument that the claims should be disallowed because Verizon had been the recipient of a fraudulent transfer.  ROA 21342, 21348, 21349, 21350.

this case in district court and was vigorously pursuing its fraudulent transfer claims. The validity of Idearc's objections does not alter the fact that the bankruptcy court was required to consider the fraudulent transfer issue as a component of the claims-allowance process. Thus, we reject the Trustee's argument.

### 2. Resolution of the Proofs of Claim

Claim No. 2450 appears to be provisionally resolved, and Idearc is specifically authorized to reopen the claim following the outcome of this litigation.[4] On December 29, 2011, the bankruptcy court entered a stipulated order on Idearc's objections to all four of Verizon's claims. *See In re Idearc Inc.*, No. 09-31828 (Bankr. N.D. Tex. Dec. 29, 2011) (Doc. 3019). The order acknowledged that this lawsuit was pending in the district court. *Id*. at 3. The bankruptcy court provisionally disposed of Claim No. 2450, which it called the "Distribution Agreement Claim," as follows:

> Determination of Distribution Agreement Claims. With the exception of the . . . § 502(d) Objections, the allowance and amount of Verizon's Distribution Agreement Claims *may be determined in the Litigation Trust/Verizon Lawsuit.* To the extent those claims are so determined and allowed, such determination and allowance shall be binding on the Reorganized Debtors, except that the . . . § 502(d) Objections shall be preserved. In such event, if (i) a judgment is entered in the Litigation Trust/Verizon Lawsuit against Verizon for actual or constructive fraudulent transfer, or for any cause of action brought by the Litigation Trust premised on fraud, including but not limited to promoter fraud or alter ego, and (ii) the Reorganized Debtors' Bankruptcy Cases have been closed pursuant to section 350 of the Bankruptcy Code, within 60 days following the completion, including all appeals, of the Litigation Trust/Verizon Lawsuit, the Reorganized Debtors, at

---

[4] Additionally, Claim No. 1779 was "withdrawn with prejudice except to the extent of Verizon's claims under the Distribution Agreement [Claim No. 2450]." *In re Idearc Inc.*, No. 09-31828 (Bankr. N.D. Tex. Dec. 29, 2011) (Doc. 3019 at 4). Since Claim No. 2450 may be re-opened should the Trustee prevail in this litigation, it is possible that Claim No. 1779 could be impacted by this litigation as well.

Verizon's request, shall file an agreed motion *to re-open the Bankruptcy Cases for the sole purpose of determining the . . . § 502(d) Objections to the Verizon Proofs of Claim.* If the allowance and amount of Verizon's Distribution Agreement Claims are not determined in the Litigation Trust/Verizon Lawsuit, then the agreed motion to re-open the Bankruptcy Cases shall be for the purpose of determining the allowance and amount of Verizon's Distribution Agreement Claims and resolving . . . § 502(d) Objections to the Verizon Proofs of Claim.

*Id.* at 5 (emphasis added).

The resolution of the fraudulent transfer claims in this lawsuit and Claim No. 2450 in the bankruptcy proceeding are interconnected. The bankruptcy court has expressly permitted Verizon to re-open Claim No. 2450 depending on the outcome of this litigation. Thus, the resolution of the fraudulent transfer claims before us will directly impact the claims-allowance process.[5]

The Trustee asserts that Verizon's proofs of claim are "irrelevant" to the Trustee's jury rights. It argues that the fraudulent transfer claims would not "necessarily have been resolved in the course of allowing or disallowing the claims against" Idearc, since Claim No. 2450 relates to a limited indemnification in a distribution agreement for misrepresentations in financing and registration documents. However, the Trustee's argument misconstrues what it means for a claim to have necessarily been resolved in the course of the claims-allowance process. This inquiry does not consider the basis for the underlying claim against the bankruptcy estate; it turns on the merits of the § 502(d) objection.

---

[5] As discussed above, even absent the bankruptcy court's express order, it is clear that the resolution of Claim No. 2450 in the bankruptcy court would have required the resolution of the Trustee's fraudulent transfer claim.

*3.* Langenkamp *Applies to Debtors*

Next, we consider whether the rule in *Granfinanciera* and *Langenkamp* applies to a debtor, even though *Langenkamp* considered the jury rights of a creditor. This court considered a similar question in *In re Jensen*, 946 F.2d 369 (5th Cir. 1991), *abrogated on other grounds*, *In re El Paso Elec. Co.*, 77 F.3d 793, 794 (5th Cir. 1996). There, a debtor sought a jury trial on its pre-petition state law claims. *Id.* at 370. The court held that the debtor was entitled to a jury trial because "the debtors' claims do not here 'arise as part of the process of allowance and disallowance of claims.' Nor are they 'integral to the restructuring of debtor-creditor relations.'" *Id.* at 374 (quoting *Granfinanciera*, 492 U.S. at 58) (internal citation omitted). Relevant to our inquiry is that *In re Jensen* framed the right to a jury trial in terms of the nature of the claims, placing no importance on the fact that the debtor, as opposed to the creditor, sought a jury trial. In fact, in resolving this issue, *In re Jensen* agreed with the Seventh Circuit's decision in *In re Hallahan*, which "reasoned that if creditors lose their jury trial rights by presenting claims against the estate, 'debtors who initially choose to invoke the bankruptcy court's jurisdiction to seek protection from their creditors cannot be endowed with any stronger right.'" *Id.* (quoting *In re Hallahan*, 936 F.2d 1496, 1505 (7th Cir. 1991)). Thus, under *In re Jensen*, a creditor and a debtor alike are bound by the rule in *Langenkamp*.

*4.* Langenkamp *Applies to Litigation Trusts*

Since a debtor would be bound by *Langenkamp*, Idearc would not have a right to a jury trial on its fraudulent transfer claims against Verizon. Yet, the Trustee claims that, as a representative of the Litigation Trust, it has a right to a jury trial where the debtor would have none.

To evaluate this claim, we consider the precise rights transferred to the Litigation Trust under the Plan. *See, e.g.*, *Torch Liquidating Trust ex rel.*

No. 13-10752

*Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 387 (5th Cir. 2009) ("To show standing based on the plan's effectuation of such a transfer, the trustee must show: '(1) that it has been appointed, and (2) that it is a representative of the estate.'" (quoting *In re Tex. Gen. Petroleum Corp.*, 52 F.3d at 1335)).  The Plan transferred "to the Litigation Trust the Litigation Trust Rights, with good, clean title to such property, free and clear of all liens, charges, Claims, encumbrances and interests, to be pursued by the Litigation Trustee for the benefit of [unsecured creditors]."[6]  ROA 7406.  The purpose of the Litigation Trust, as defined by the Plan, was to "prosecut[e] the Litigation Trust Rights and distribut[e] the proceeds thereof in accordance with the Plan and the Litigation Trust Agreement, with no objective to continue or engage in the conduct of a trade or business." ROA 7406.  The Plan defines "Litigation Trust Rights" as the

> Litigation Rights of the Debtors and the Debtors' Estates consisting of claims or causes of action, including applicable privileges, (i) arising under or pursuant to Chapter 5 of the Bankruptcy Code, which include, but are not limited to, actions involving . . . preferences and fraudulent transfers . . . , and (ii) belonging to the Debtors and the Debtors' Estates against the Debtors' officers or directors . . . .  Unless otherwise released or enjoined by the Plan, compromise approved by the Bankruptcy Court, or other order of the Bankruptcy Court, Litigation Trust Rights shall also include all claims and causes of action of the Debtors and the Estates, including applicable privileges, against Verizon . . . and other Persons relating to the spinoff of the Debtors from Verizon, including, without limitation, *avoidance causes of action under Bankruptcy Code sections 544, 547, 548, 550 and 551* and claims and causes of action for (a) breach of fiduciary duty, (b) fraud, (c) fraud in the inducement, (d) aiding and abetting a breach

---

[6] The "unsecured creditors" mentioned in the Plan are the: "Allowed Unsecured Note Claims, Allowed Unsecured Credit Facility Claims[,] and Allowed General Unsecured Claims (to the extent the holders of such Allowed General Unsecured Claims have elected treatment under Sub-Class 1 of Class 4 of the Plan) as provided in the Plan and Litigation Trust Agreement." ROA 7406.

of fiduciary duty, (e) illegal dividends, (f) unjust enrichment, and (g) violations of state and federal securities laws or other applicable state or federal law.

ROA 7389 (emphasis added).

The confirmed plan clearly transferred Idearc's §§ 544 and 550 claims to the Litigation Trust, without modification. In so doing, Idearc lost standing to pursue these claims on behalf of the estate. *In re MPF Holdings*, 701 F.3d at 454. As contemplated by § 1123(b)(3)(B) of the Bankruptcy Code, the Litigation Trust is the representative of Idearc in pursuing these claims. Thus, the district court correctly observed that the Trustee stands in the shoes of Idearc. Since the Trustee is effectively Idearc for the purposes of this litigation, and since Idearc would have no Seventh Amendment right to a jury trial, the Trustee also lacks such a right.

The Trustee, ignoring the text of the Plan and § 1123(b)(3)(B) of the Bankruptcy Code, challenges the conclusion that a litigation trustee will generally stand in the shoes of the debtor. It argues that the Trustee acts instead for the beneficiaries, here unsecured creditors,[7] and its right to a jury trial should not be extinguished even if Idearc would have lacked such a right. The Trustee relies heavily on *Crescent Resources Litigation Trust v. Duke Energy Corp.*, No. A-12-CA-009-SS, 2013 WL 1865450 (W.D. Tex. May 2, 2013). In *Crescent*, the debtors entered into bankruptcy, and the bankruptcy court confirmed the debtor's plan of reorganization which, inter alia, created a litigation trust to "pursue causes of action which the Debtor could have asserted, including avoidance actions and other claims arising outside of the ordinary course of business of the Debtors." *Id.* at *2. The litigation trust

---

[7] Unsecured creditors, of course, are exactly for whom Idearc would have been acting if the fraudulent transfer claims had not been transferred to the Litigation Trust and had been, instead, pursued by Idearc post confirmation.

brought a fraudulent conveyance action against two creditors in district court. *Id.* at \*3. The trust demanded a jury trial, but one creditor sought to strike the jury. *Id.* The creditor argued that the right was extinguished because the defendants filed proofs of claim in the bankruptcy proceeding, and the debtor objected to the proofs of claim on the basis of fraudulent conveyance under § 502(d). *Id.*

*Crescent* agreed with the trust, holding that *Langenkamp* did not apply to litigation trusts and explicitly disagreeing with the district court's holding in this case. *Id.* at \*4. In so doing, *Crescent* relied on a Seventh Circuit decision that differentiated between a liquidation trust and a debtor. *Id.* (quoting *Grede v. Bank of New York Mellon*, 598 F.3d 899, 902 (7th Cir. 2010)). According to the Seventh Circuit in *Grede*,

> Although the terms of the Bankruptcy Code govern the permissible duties of a trustee in bankruptcy, the terms of the plan of reorganization (and of the trust instrument) govern the permissible duties of a trustee after bankruptcy. A liquidation trust is no different in this respect from a reorganized debtor. . . . People are tempted to assume that bankruptcy is forever and that the Code continues to regulate the conduct of former debtors. We have held otherwise. The . . . Liquidation Trust is a post-bankruptcy vehicle[.]

*Grede*, 598 F.3d at 902 (internal citations omitted). *Crescent* acknowledged that *Grede* considered a different issue than the one before the court, but it believed that *Grede*'s "holding that the strictures of the Bankruptcy Code do cut off at some point, and actions by a liquidation trust, post-plan confirmation[,] is after that point, is helpful here in determining whether the holdings of *Granfinanciera* and *Langenkamp* are applicable to . . . a post-plan litigation trust." *Crescent*, 2013 WL 1865450, at \*5 n.1. Therefore, *Crescent* concluded that *Langenkamp* was limited to bankruptcy trustees and did not apply to litigation trustees. *Id.* at \*5.

17

No. 13-10752

*Crescent*'s reliance on *Grede* is misplaced, since the Seventh Circuit answered a different legal question than the one at issue in *Crescent* and here. *Grede* concerned the authority of a litigation trustee to bring claims on behalf of third parties (as well as the debtor).[8] 598 F.3d at 900. *Grede* acknowledged that, under the Supreme Court's decision in *Caplin*, 406 U.S. at 428, a bankruptcy trustee does not have the authority to sue third parties on behalf of investors who believed that the third party's act had injured them and the debtor jointly. *Id.* However, the court distinguished *Caplin*, explaining that none of the concerns raised in *Caplin* applied to a suit by a liquidation trustee on assigned claims from third parties. *Id.* at 902.

Returning to the present issue (and the issue before the *Crescent* court), we must consider the nature of the claim brought by the Trustee, and whether that claim is legal and entitled to a jury trial, or equitable because of its connection with the resolution of the claims-allowance process. *Grede* was concerned with a liquidation trustee's authority to bring the assigned claims of third parties. We have no quarrel with *Grede*'s conclusion that a post-bankruptcy liquidation trust established by a confirmed plan would be governed by the plan itself (as distinguished from the Bankruptcy Code). But *Grede* did not hold that a claim that is by law integral to the resolution of the

---

[8] In *Grede*, Sentinel Management Group, Inc., entered bankruptcy, the bankruptcy court confirmed a Chapter 11 reorganization plan, and the bankruptcy court appointed a liquidation trustee. *See* 598 F.3d at 900. Many of Sentinel's customers believed that Sentinel had defrauded them along with the Bank of New York Mellon, which was Sentinel's clearing bank, lender, and depository for investment pools. *Id.* As part of the reorganization plan, Sentinel's fraudulent conveyance claims against the Bank had been transferred to a liquidation trust. *Id.* Although the investors' claims against the Bank did not belong to Sentinel and were not part of the bankruptcy estate, the terms of the liquidation trust also permitted investors to assign their claims to the trust for collection, which many investors did. *Id.* The trustee filed a fraudulent conveyance action in federal court to pursue the investors' claims. The Bank objected to the trustee's authority to bring the action on the ground that the trustee lacked authority to pursue the investors' claims under *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972). *Id.*

claims-allowance process is no longer integral to that process when it is pursued by a litigation trustee. Since *Grede* is not on point, and since the Trustee has presented us with no authority to support its position, we cannot say that a litigation trustee would have a right to a jury trial where the debtor, whose claims it is pursuing, would have none. Thus, we reject the Trustee's argument that *Langenkamp* does not apply to a litigation trustee pursuing the debtor's fraudulent transfer claims.

5. Stern *Did not Overrule* Langenkamp

The Trustee's final argument relies on *Stern*, 131 S. Ct 2594, to assert that the fraudulent transfer action must be tried by an Article III court before a jury, irrespective of the proofs of claim filed in the bankruptcy court. The Trustee concludes that *Langenkamp* is simply inapplicable under *Stern*. However, *Stern* is not as broad as the Trustee suggests; in fact, *Stern* both distinguished and explicitly preserved *Langenkamp*. *See* 131 S. Ct. at 2617–18.

In *Stern,* a creditor filed a proof of claim in the bankruptcy proceeding seeking recovery from the estate on a state law defamation claim. *Id.* at 2601. The debtor later filed a counterclaim against the creditor for fraudulent inducement. *Id.* The bankruptcy court entered final judgment in the debtor's favor on the counterclaim. *Id.* The issue before the Supreme Court was whether the bankruptcy court had jurisdiction to hear the counterclaim. *Id.* The Court held that the debtor's counterclaim was a core proceeding under the plain text of 28 U.S.C. § 157(b)(2)(C), which states that "counterclaims by the estate against persons filing claims against the estate" are "core proceedings." *Id.* at 2604–05 (internal quotation marks omitted). However, *Stern* also declared that § 157(b)(2)(C) was unconstitutional to the extent that it permitted bankruptcy courts to enter final judgments in state law

counterclaims that would not necessarily be resolved in the process of ruling on a creditor's proof of claim. *Id.* at 2620.

In reaching its holding, *Stern* addressed the debtor's argument that the bankruptcy court had the authority to adjudicate its counterclaim under *Langenkamp* because the creditor had filed a proof of claim in the bankruptcy proceedings. *Id.* at 2615–16. *Stern* distinguished *Langenkamp*, explaining that, under *Langenkamp*,

> [A] preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because then "the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship." If, in contrast, the creditor has not filed a proof of claim, the trustee's preference action does not "become[] part of the claims-allowance process" subject to resolution by the bankruptcy court.

*Id.* at 2617 (quoting *Langenkamp*, 498 U.S. at 44, 45) (internal citation omitted) (alterations in original). Unlike *Langenkamp*, the debtor's counterclaim against the creditor was not part of the claims-allowance process in *Stern*. The Court explained that the bankruptcy court made several factual and legal determinations in ruling on the counterclaim that were not dispositive of the creditors' claim against the estate. *Id.* Despite some similarity between the debtor's counterclaim and the creditor's defamation claim, "there was never any reason to believe that the process of adjudicating [the creditor's] proof of claim would necessarily resolve [the debtor's] counterclaim." *Id.* Likewise, while in *Langenkamp* "the trustee bringing the preference action was asserting a right of recovery created by federal bankruptcy law," in *Stern,* the debtor's counterclaim was "in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding." *Id.* at 2618.

After distinguishing *Langenkamp*, *Stern* analogized the debtor's counterclaim to the fraudulent conveyance action in *Granfinanciera*, which had been entitled to a jury trial. *Id.* The Court explained that

> *Granfinanciera*'s distinction between actions that seek "to augment the bankruptcy estate" and those that seek "a pro rata share of the bankruptcy res," reaffirms that Congress may not bypass Article III simply because a proceeding may have some bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.

*Id.* (quoting *Granfinanciera*, 492 U.S. at 56) (internal citation omitted).

It is clear from *Stern* that *Langenkamp* is still good law. *Stern* did not displace *Langenkamp*; in fact, it took great care to distinguish the facts before it from the facts in *Langenkamp*. Moreover, the claim at issue here is analogous to the one in *Langenkamp* and distinguishable from the debtor's counterclaim in *Stern*. As previously discussed, resolution of Verizon's proof of claim will require ruling, under § 502(d), on whether Verizon was the recipient of a fraudulent transfer. This involves the same factual and legal determinations made by the district court in this case in resolving the fraudulent transfer claim by the Trustee, the debtor's representative, against Verizon. Also, unlike the debtor's counterclaim in *Stern*, here the Trustee's claim is derived, in part, from bankruptcy law (§§ 544 and 550).

The Supreme Court very recently revisited *Stern* in *Executive Benefits Insurance Agency v. Arkison*, 134 S. Ct. 2165, --- U.S. --- (2014). *Executive Benefits* describes *Stern*'s core inquiry as whether Article III of the Constitution prohibits a bankruptcy court from finally adjudicating certain types of claims but noted that *Stern* "did *not*, however, decide how bankruptcy or district courts should proceed when a '*Stern* claim' is identified." *Id.* at

21

2168.[9] *Executive Benefits* resolved how courts should proceed in adjudicating a "*Stern* claim" and held that while a bankruptcy court may not enter a final judgment on a "bankruptcy-related claim," a bankruptcy court may issue proposed findings of fact and conclusions of law to be reviewed de novo by the district court. *Id.* In reaching this conclusion, *Executive Benefits* did not discuss the right to a jury trial.[10] In light of the Supreme Court's recent clarification of *Stern*, we reject the Trustee's argument that *Stern* requires that its fraudulent transfer claim against Verizon be heard by a jury.

In sum, the Trustee's fraudulent transfer claims against Verizon are "integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's equity jurisdiction." *See Langenkamp*, 498 U.S. at 44. Resolution of Verizon's proof of claim in the bankruptcy court would necessarily resolve the fraudulent transfer issue. In fact, in this specific case, the bankruptcy court entered an order that provisionally disposed of the claim subject to the outcome of this very litigation, thus clarifying that the claims in this court are indeed related to the restructuring of the debtor-creditor relationship. Additionally, while it is no problem, it is also of no import, that a litigation trustee has brought this claim, since a *Langenkamp* inquiry focuses on the *nature* of the claim and not on *who* has brought the claim. *See, e.g., In*

---

[9] *Executive Benefits* defined a "*Stern* claim" as "a claim designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter." 134 S. Ct. at 2170.

[10] The Court's only mention of a jury trial in *Executive Benefits* was in the procedural background, when it commented that there had been some dispute in the district court as to whether the trustee's claims should proceed before a jury in district court. 134 S. Ct. at 2169. The trustee ultimately moved for summary judgment, indicating that the matter of a jury trial was not relevant to the legal issue presented to the Supreme Court. *Id.* Additionally, the Court briefly summarized the holding of *Granfinanciera* in a footnote, which mentioned the right to a jury trial. *Id.* at 2169 n.3.

*re Jensen*, 946 F.2d at 374. Accordingly, we affirm the district court's order granting the motion to strike the jury.

## C. Waiver

On appeal, the Trustee raises numerous challenges to the district court's ruling that have been waived. This court will typically not consider an issue or a new argument raised for the first time in a motion for reconsideration in the district court. *Lincoln Gen. Ins. Co. v. De La Luz Garcia*, 501 F.3d 436, 442 (5th Cir. 2007); *Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir. 1999) (per curiam). Additionally, "[i]t is not enough to merely mention or allude to a legal theory" in order to "raise an argument." *United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) (citing *McIntosh v. Partridge,* 540 F.3d 315, 325 n.12 (5th Cir. 2008)). Rather, "a party must press its claims," which entails "clearly identifying a theory as a proposed basis for deciding the case—merely intimat[ing] an argument is not the same as pressing it." *Id.* at 447 (internal quotation marks and citation omitted) (alteration in original).

The Trustee raised its arguments concerning a right to a jury trial on its non-fraudulent-transfer claims and claims against Diercksen for the first time in its motion for reconsideration of the district court's order striking the jury. Although the Trustee made a brief reference to its breach of fiduciary duty and aiding and abetting claims in its response in opposition to the motion to strike, this is insufficient to preserve the Trustee's arguments.[11] *Scroggins*, 599 F.3d

---

[11] The Trustee's only reference to its non-fraudulent transfer claims is contained in a footnote that reads:

> [Appellees] erroneously argue that [the Trustee] is not entitled to a jury trial on its breach of fiduciary duty and aiding and abetting breach of fiduciary duty because such claims are "equitable." Because [the Trustee] seeks monetary relief for its fiduciary duty breach claims, the claims are "legal" rather than equitable and are protected by the Seventh Amendment.

ROA 21597 n.8 (internal citation omitted). This footnote only states that the breach of fiduciary duty and aiding and abetting claims are legal claims; it in no way asserts that these

at 446.  Accordingly, in its order denying reconsideration, the district court concluded that these arguments had been waived.[12]    *U.S. Bank (Reconsideration)*, 2012 WL 3034707, at \*4.  We agree.  Since the arguments concerning the right to a jury trial on the non-fraudulent-transfer claims and on the claims with respect to Diercksen have been waived, we will not consider them here.[13]

---

claims are not part of the equitable claims-allowance process, which is at issue here. Additionally, it does not discuss Diercksen, nor does it allege that the claims against Diercksen should be treated differently for jury trial purposes.  The district court, in its order denying reconsideration, commented that the Trustee "only alluded to its claims of breach of fiduciary duty and aiding and abetting breach of fiduciary duty" in its briefing on the motion to strike, so the court concluded that the Trustee's discussion of these claims in its motion for reconsideration constituted the presentation of a new argument.  *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, 3:10-CV-1842-G, 2012 WL 3034707, at \*4 (N.D. Tex. July 25, 2012) (hereinafter "*U.S. Bank (Reconsideration)*").  We agree.  This footnote alone cannot be said to have sufficiently presented the legal issues to the district court for review.

[12] The Trustee mischaracterizes the district court's and Appellees' discussion of waiver, and claims that it never waived its right to a jury trial.  However, the discussion of waiver is limited to arguments that were not properly raised before the district court.

[13] The Trustee also contends that the district court granted relief on grounds not raised by Appellees since Appellees' motion to strike the jury demand did not address all of the Trustee's claims.  This argument is unavailing.  Appellees' motion to strike incorporated all of the Trustee's claims.  ROA 1866 ("its claims are part of the claims[-]allowance process"), 1869 (discussing "its fraudulent transfer and other claims").  Additionally, the motion was clearly labeled as a motion to strike the jury.  ROA 1843, 1866–69.  Appellees did not move to strike the jury for only portions of the trial.  The district court correctly concluded that the motion sought to strike a jury as to *all* claims contained in the complaint.  The Trustee bore the burden of rebutting the motion to strike by raising all of the reasons entitling it to a jury trial.  The Trustee is represented by sophisticated counsel, and the record indicates that the district court routinely permitted additional briefing and enlarged the page limits to accommodate the parties.  Thus, the Trustee was afforded ample opportunity to raise its arguments before the district court.  However, the Trustee only raised arguments concerning the fraudulent transfer claims with respect to Verizon in its response and sur-reply in opposition to the motion to strike.  In so doing, it waived its arguments concerning its claims against Diercksen and its non-fraudulent transfer claims against Verizon.  *Lincoln Gen.*, 501 F.3d at 442.

No. 13-10752

## III.   Subsidiary Issue

During summary judgment, the district court found that Idearc was a wholly-owned subsidiary of Verizon prior to the spin-off, and the court later referenced this finding as part of its evidentiary rulings, findings of fact, and conclusions of law.  Thus, in challenging many of the district court's rulings, the Trustee frequently argues that the district court erred in part because Idearc was not Verizon's wholly-owned subsidiary.  Accordingly, we will address Idearc's subsidiary status separately since the matter is raised throughout the appeal.

In its September 14, 2012 order granting in part and denying in part summary judgment, the district court addressed the subsidiary issue.  *See U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 817–18 (N.D. Tex. 2012) (hereinafter "*U.S. Bank (Summary Judgment)*").  Diercksen moved for summary judgment on the Trustee's breach of fiduciary duty claim, arguing that his fiduciary duties were owed to Verizon because Idearc was a wholly-owned subsidiary of Verizon.[14]  *Id.*  The court noted that the parties disputed whether Idearc was a wholly-owned subsidiary of Verizon, and, after considering the evidence presented by both parties, held that "no reasonabl[e] factfinder could conclude that Idearc was not a wholly-owned subsidiary of Verizon." *Id.* at 818.  However, because Diercksen would owe Idearc fiduciary duties if the corporation was insolvent on the day of the spin-off, and since there was a fact dispute as to the value of Idearc on that date, the district court denied summary judgment on the claim.  *Id.* at 814, 818.

---

[14] Diercksen's argument was based on the Delaware Supreme Court's ruling in *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988). *Anadarko* will be discussed at length in Sections VI.D. and VI.E.

No. 13-10752

Following the bench trial, the Trustee re-raised its argument that Idearc was not a wholly-owned subsidiary in its response to the district court's order to show cause. The district court interpreted the Trustee's arguments as a belated request to reconsider its subsidiary finding in the summary judgment order. *See U.S. Bank Nat'l Ass'n v. Verizon Commc'n, L.L.C.*, No. 3:10-cv-1842-G-BK (N.D. Tex. June 18, 2013) (Doc. 671 at 18) (hereinafter "Conclusions of Law"). Since the Trustee offered no new evidence that was not available to it during the summary judgment phase, and since there was no intervening change in the law, the district court declined to reconsider its holding that Idearc was a wholly-owned subsidiary. *Id.*

On appeal, the Trustee argues that the district court's reliance on its summary judgment subsidiary statement was improper because the statement was dictum.[15] We disagree. "A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it." *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004) (internal quotation marks and citation omitted). However, if the statement is "necessary to the result or constitutes an explication of the

---

[15] The Trustee also claims that under Federal Rule of Civil Procedure 56(g), the "subsidiary statement" was not binding because: (1) Appellees did not request a finding on this fact; (2) the district court did not refer to Rule 56(g) or state that any facts would be treated as established in this case; and (3) the fact was "irrelevant" to the denial of summary judgment. The Trustee's Rule 56(g) argument is unavailing. Under Rule 56(g), "[i]f the court does not grant all the relief requested by the motion, it *may* enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g) (emphasis added). The Rule's use of the word "may," as opposed to "shall," indicates that district courts are not *required* to enter a separate order under Rule 56(g). Further, the Trustee has not presented us with Fifth Circuit caselaw that interprets Rule 56(g) in such a manner. More importantly, the Trustee did not raise its Rule 56(g) argument before the district court in its response to the order to show cause, and it only briefly mentioned the Rule for the first time in its reply brief. Thus, this argument has been waived. *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010).

governing rules of law," it is not dictum. *Id.* Here, whether Idearc was a wholly-owned subsidiary was squarely before the court, and it was considered as part of the analysis of the breach of fiduciary duty claim. Diercksen had argued that because Idearc was a wholly-owned subsidiary of Verizon, it owed no fiduciary duties to Idearc. *U.S. Bank (Summary Judgment)*, 892 F. Supp. 2d at 817. The Trustee countered that Idearc was not a wholly-owned subsidiary. *Id.* The district court necessarily analyzed this issue in order to determine the legal duties owed by Diercksen to Idearc, and it concluded that there was no genuine issue of material fact as to Verizon's sole ownership of Idearc. *Id.* Thus, the district court's statement was not dictum since it was necessary to its final breach of fiduciary duty analysis.

Next, the Trustee appeals the district court's refusal to reconsider its summary judgment ruling in light of the "undisputed evidence" that Verizon did not validly own stock.[16] The undisputed evidence has two components. First, the Trustee focuses on the failure of Verizon to properly form Idearc's board. Idearc's bylaws created a two-member board of directors and a quorum also required two members. The Trustee argues that since Diercksen was the only board member, all of his unilateral actions were illegal and void, including his resolution issuing stock. Second, the Trustee claims that Verizon never validly owned Idearc stock because the resolutions issuing one share of stock and authorizing Harless to sell that share did not list a price. According to the Trustee, Verizon consequently did not pay for the stock, so it never owned the stock.

---

[16] The Trustee briefly argues that the district court's summary judgment order failed to "take into account the evidence that Idearc never validly issued shares"; however, the Trustee does not specifically appeal this aspect of the summary judgment order. The Trustee did appeal other elements of the summary judgment order, but did not identify the subsidiary finding as one of the issues on appeal. Rather, the focus of the Trustee's appeal appears to be on the denial of reconsideration.

We review the district court's denial of a request to reconsider a summary judgment ruling for abuse of discretion. *Templet v. HydroChem Inc.*, 367 F.3d 473, 477 (5th Cir. 2004). "[A] district court has considerable discretion in deciding whether to reopen a case in response to a motion for reconsideration, [but] such discretion is not limitless." *Id.* at 479. The court must balance two competing interests in ruling on a motion to reconsider: "1) the need to bring litigation to an end; and 2) the need to render just decisions on the basis of all the facts." *Id.* When a party requests reconsideration of a summary judgment order and submits evidentiary materials in support of its motion that were not previously provided to the court, the court may consider the following factors:

> 1) [T]he reasons for the moving party's default; 2) the importance of the omitted evidence to the moving party's case; 3) whether the evidence was available to the non-movant before it responded to the summary judgment motion; and 4) the likelihood that the non-moving party will suffer unfair prejudice if the case is reopened.

*Id.* at 482 (citing *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 174 (5th Cir. 1990), *overruled on other grounds*, *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994)). However, a request to reconsider a non-final, non-appealable partial summary judgment order "remains within the plenary power of the district court to revise or set aside in its sound discretion without any necessity to meet the requirements of Fed. R. Civ. P. 60(b)." *Avondale Shipyards, Inc. v. Insured Lloyd's*, 786 F.2d 1265, 1269 (5th Cir. 1986).

Here, the Trustee did not file a formal motion for reconsideration following the entry of the district court's summary judgment order. Months later, after the trial, the Trustee included a request to reconsider the subsidiary issue in its response to the order to show cause. The district court made note of the Trustee's request to reconsider its subsidiary finding in its conclusion of law, but it declined to do so. According to the district court,

reconsideration of the subsidiary issue was inappropriate because the Trustee had not requested reconsideration of the summary judgment order, cited no intervening change in the law, and had access to all the evidence on which it relied to reargue this point during the summary judgment stage. Conclusions of Law at 18–19.

The subsidiary finding at summary judgment was not a final judgment on a claim, so it is not subject to the strict requirements of Rule 60. *See Avondale Shipyards*, 786 F.2d at 1269. Yet, the decision to reconsider the finding is nonetheless left to the sound discretion of the district court. *Id.* The district court did not abuse its discretion. The request for reconsideration was untimely and the evidence presented by the Trustee in response to the order to show cause was available at the summary judgment stage. The Trustee does not dispute this. Due to the size of the record and the number of extensions granted by the district court throughout the proceedings, it is unclear why the Trustee failed to timely raise its arguments.

Additionally, we are not persuaded that the Trustee's arguments have merit, specifically because the Trustee does *not* claim that any other person or entity owned Idearc before the spin-off (a fact that, if it were true, would affect Diercksen's fiduciary duties). Likewise, the Trustee does not argue that Idearc or its board owed fiduciary duties to non-Verizon shareholders prior to the spin-off. The Trustee only cursorily responds that Delaware law does not require that a corporation issue stock in order to exist. *See* Del. Code Ann. tit. 8, § 106 (West 2014). However, this one-sentence explanation only raises more questions, none of which the Trustee answers. As a practical matter, if no one owned Idearc, then to whom did Diercksen owe fiduciary duties before the spin-off? At that time, Idearc was a shell corporation, with no assets, that existed only on paper. To base a $9.1 billion claim for damages on Diercksen's alleged breach of fiduciary duties owed solely to an empty shell corporation is, to say

the least, problematic.  At minimum, this is an issue that deserves more than one sentence in a lengthy brief.  Moreover, the Trustee failed to argue before the district court in its response to the order to show cause that Idearc could exist without shareholders, even though the district court had also noted at summary judgment that the Trustee had failed to indicate who may have owned Idearc.  *U.S. Bank (Summary Judgment)*, 892 F. Supp. 2d at 818 (holding that the Trustee "has not put forth any evidence that any other entity owned Idearc at the time leading up to the spin-off").

Because the request to reconsider was untimely, based entirely on evidence that was available at the summary judgment stage, and lacks merit, we affirm the district court's denial of reconsideration.

## IV.    Evidentiary Rulings

The Trustee raises two challenges to the district court's evidentiary rulings.  First, the Trustee claims that the district court erroneously admitted hundreds of allegedly irrelevant exhibits prior to the Phase I trial.  Second, it contests the court's exclusion of supposedly relevant evidence and testimony during the trial.  We reject these arguments.

This court reviews evidentiary rulings for abuse of discretion.  *Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000).  "[A] trial court has broad discretion in determining the admissibility of evidence based on relevance and materiality, and that determination will be overturned only when the abuse of that discretion is *clearly* shown from the record." *United States v. Collins*, 690 F.2d 431, 438 (5th Cir. 1982) (emphasis added).  Even when evidence is relevant, it may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

If the district court has abused its discretion in excluding or admitting evidence, "[w]e reverse judgments for improper evidentiary rulings only where the challenged ruling affects a substantial right of a party. The burden of proving substantial prejudice lies with the party asserting error." *Gabriel*, 202 F.3d at 745 (internal quotation marks and citations omitted); *see also First Nat'l Bank of Louisville v. Lustig*, 96 F.3d 1554, 1574 (5th Cir. 1996). A ruling has affected the substantial rights of the party if, when considering all of the evidence presented at trial, the ruling had a substantial effect on the outcome of the trial. *See United States v. Limones*, 8 F.3d 1004, 1008 (5th Cir. 1993). However, if the error was harmless, it will be excused. *See United States v. Hart*, 295 F.3d 451, 454 (5th Cir. 2002).

Turning to the Trustee's first challenge, the allegedly irrelevant exhibits at issue were exhibits initially identified by the Trustee and included on its exhibit list, without objection from Appellees. At the pre-trial conference, the district court informed the parties that, given the large number of exhibits that would be presented at trial, the court would admit evidence from the exhibit lists in groups if there was no objection from the opposing party. ROA 16259. After the pre-trial conference and only a week before trial, the Trustee sought to exclude 315 of its own exhibits from the trial. The district court ultimately admitted all the exhibits, believing that the attempt to exclude them was "a tactic on behalf of the [Trustee]." ROA 16335.

On appeal, the Trustee has not discussed the content of the admitted documents, nor has it explained why these documents were irrelevant. Absent even a description of the documents, we cannot conclude whether the court's decision to admit them was an abuse of discretion. *Collins*, 690 F.2d at 438. Additionally, the Trustee has not shown how the admission of these documents affected its substantial rights, so any error would not be reversible. *Gabriel*, 202 F.3d at 745.

The Trustee's second challenge is to the district court's refusal to admit evidence of Idearc's alleged corporate deficiencies. This includes the following: testimony that no board of Idearc was ever appointed; testimony that the issuance of Idearc stock was "false"; evidence that Idearc never properly issued any stock, so it could not have been a wholly-owned subsidiary; evidence that Idearc's corporate records, including a stock certificate, were backdated; and a memo "demonstrat[ing] that the backdated stock certificates and secretary certificates . . . were not sent to [directors] for signature until . . . after the private letter ruling issued." The Trustee claims that the errors affected the court's valuation finding and conclusions of law, particularly with respect to the court's holding that Idearc was a wholly-owned subsidiary.

The Trustee's challenge fails for two reasons. First, the district court had previously ruled, at summary judgment, that Idearc was a wholly-owned subsidiary of Verizon. *See U.S. Bank (Summary Judgment)*, 892 F. Supp. 2d at 817–18. Later, while ruling on a motion *in limine*, the district court noted that the Trustee had failed to show that the failure to observe corporate formalities prior to the spin-off "significantly affected the underlying fundamentals of the company." ROA 13631. Idearc's subsidiary status had already been decided, and that decision had gone unchallenged up to that point. Even if the Trustee's proffered evidence had been relevant to the valuation issue (and it is not clear that it is), the court did not abuse its discretion by declining to hear more evidence on a matter that had already been decided. *See* Fed. R. Evid. 403.

Assuming that the district court did err in excluding the evidence, it is unclear how it impacted the Trustee's substantial rights. *See Limones*, 8 F.3d at 1008. The Trustee conclusorily states that the evidence was relevant to the valuation finding, but does not discuss how each specific piece of evidence was

No. 13-10752

likely to affect the outcome of the trial, in light of all the evidence presented. *Id.* Accordingly, we affirm the district court's evidentiary rulings.

## V.    Valuation Finding

Next, the Trustee appeals the district court's findings of fact following the ten-day bench trial, arguing that the court erred in concluding that Idearc was worth more than $12 billion on the date of the spin-off.

We review findings of fact made by a district judge during a bench trial for clear error. *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 294 (5th Cir. 2009). "A finding is 'clearly erroneous' when there is no evidence to support it, or if the reviewing court, after assessing all of the evidence, is left with the definite and firm conviction that a mistake has been committed." *Baldwin v. Taishan Gypsum Co., Ltd. (In re Chinese-Manufactured Drywall Prods. Liab. Litig.)*, 742 F.3d 576, 584 (5th Cir. 2014). When "the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985). If we determine that "there are two permissible views of the evidence," then we may not conclude that the court's choice between them was clearly erroneous. *Id.*

Following the bench trial, the district court issued a sixty-six page Memorandum of Decision that carefully discussed the exhibits and testimony presented at trial. *See U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 3:10-CV-1842-G, 2013 WL 230329 (N.D. Tex. Jan. 22, 2013) (hereinafter "*U.S. Bank (Findings of Fact)*"). The district court found, based on exhibits and the testimony of witnesses, that the value of Idearc on November 17, 2006, was at least $12 billion. *Id.* at \*1. The district court first considered the testimony of the Trustee's expert witness, Carlyn Taylor. *Id.* at \*2. While the court found her highly qualified to offer an expert opinion, it ultimately concluded that her

valuation of Idearc at $8.15 billion was unpersuasive. *Id.* at *3, *9. The court considered the three valuation calculations Taylor performed to arrive at the $8.15 billion figure, but it rejected them because: (1) they did not include all available information, such as the trading price for Idearc on NYSE; (2) the financial projections on which she relied were unreliable; and (3) there were "multiple instances of double counting that infected both Taylor's . . . analysis and her overall conclusions." *Id.* at *7–9. In coming to this conclusion, the district court relied on the expert testimony of Mark Hopkins, an expert witness for Appellees, and on the market evidence of the value of Idearc at the time of the spin-off. *Id.* at *6.

Contrary to the Trustee's claims, the district court found that the evidence of Idearc's value based on the market price of Idearc stock was a reliable indicator of Idearc's value because the market was not misled. *Id.* at *10. Upon careful consideration of the evidence, the district court concluded that the information that the Trustee alleged was withheld from the market was actually disclosed or, if not disclosed, was not material. *Id.* at *10–29.

There is no clear error in the district court's factual findings. We reject the Trustee's assertion that the district court valued Idearc without considering the clouds on its value. Clouds, such as questions regarding ownership or the ability to convey an asset, are material and can impact the value of an asset. However, the district court had previously concluded that there were no clouds on Idearc's value prior to trial, and it did not need to reconsider this finding.[17] The Trustee has not appealed these earlier rulings.

---

[17] *See U.S. Bank (Summary Judgment)*, 892 F. Supp. 2d at 818 (holding that Idearc was a wholly-owned subsidiary of Verizon); ROA 13631 (order denying the Trustee's motions *in limine*, and holding that the Trustee had not shown that the corporate formalities in the spin-off and in the issuance of Idearc stock and debt significantly affected the underlying fundamentals of the company).

No. 13-10752

Likewise, the Trustee's argument that the district court erroneously relied on Idearc's stock price at the date of the spin-off lacks merit. We must affirm the factual finding of a district court when its interpretation of the evidence is plausible after viewing the record as a whole. *Anderson*, 470 U.S. at 573–74. The district court made lengthy findings concerning the information that was and was not disclosed and the impact of that information on the market value of Idearc. We have reviewed those findings and the massive record, and we believe that the district court's conclusion that Verizon sufficiently disclosed the risks associated with a directory business is plausible in light of the record as a whole.

The Trustee's final challenge is that the district court erred by not sufficiently crediting Taylor's expert testimony and using her valuation finding. However, Taylor was heavily criticized by Hopkins, another expert witness. Although Taylor was "qualified," Hopkins was also qualified,[18] and he noted numerous errors in her methodology. The trial record also contained ample evidence with which to challenge Taylor's methods and conclusions. At minimum, Taylor's valuation and Hopkins's criticism of her methodology presented "two permissible views"; we cannot reverse the district court for adopting one permissible view over the other. *Id.*

---

[18] The Trustee states that Hopkins was not qualified to criticize Taylor's valuation because he had never done a yellow pages valuation. "[T]he only question for the trial court is whether the expert is *generally* qualified to render an opinion on the question in issue." *Christophersen v. Allied–Signal Corp.*, 939 F.2d 1106, 1110 (5th Cir. 1991) (en banc) (emphasis added). The court has wide discretion in determining whether an expert is qualified. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 274 (5th Cir. 1998). Hopkins has worked as a financial advisor and has performed many solvency and valuation analyses in the media, telecommunications, and energy industries. *U.S. Bank (Findings of Fact)*, 2013 WL 230329 at *6. Thus, the district court did not abuse its discretion in believing Hopkins was sufficiently qualified to offer an opinion on Taylor's valuation methodology.

35

There is evidence in the record to support the district court's factual findings, so we conclude that the court's finding that Idearc was worth at least $12 billion on the date of the spin-off is not clearly erroneous. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d at 584.

## VI.    Conclusions of Law

The same day the district court issued its factual findings, it also ordered the Trustee to show cause "why any (or all) of its legal claims are viable in light of the court's finding on Idearc's value," and to "identify any disputed fact issues that remain for resolution in a second phase of trial."  The Trustee complied, and after reviewing the briefs submitted by the parties, the district court disposed of the Trustee's remaining claims and entered judgment in favor of Appellees.  The Trustee now challenges the use of the order to show cause as a vehicle to enter judgment on behalf of Appellees, as well as aspects of the court's legal conclusions with respect to its claims for fraudulent transfer, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, promoter liability, unlawful dividend, and alter ego.  We will discuss each challenge in turn.

### A. Standard of Review

This court reviews conclusions of law made pursuant to Federal Rule of Civil Procedure 52 de novo.  *Bursztajn v. United States*, 367 F.3d 485, 489 (5th Cir. 2004).  We review challenges to a district court's docket management and trial procedure for abuse of discretion.  *Garcia v. Woman's Hosp. of Tex.*, 143 F.3d 227, 229 (5th Cir. 1998) (per curiam).

### B. Procedural Challenge

The Trustee first attacks the procedures of the district court, claiming that its use of the show-cause order following the Phase I bench trial was inappropriate because there were outstanding fact issues and the Trustee was not afforded the opportunity to "marshal its proof" on the remaining claims.

We interpret this as a challenge to the district court's case management procedures, and we find that the district court did not abuse its discretion in utilizing an order to show cause to provide the Trustee with a final opportunity to address its claims before issuing conclusions of law.

Under the Federal Rules of Civil Procedure, following an action tried without a jury, "the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1). Once a party has been heard on an issue during a bench trial, "the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c).

Here, the district court issued an extensive memorandum opinion discussing its factual findings following the bench trial in accordance with Rule 52(a). On the same day it issued its factual findings, it entered the show-cause order, indicating that the court was prepared to enter judgment in favor of Appellees on all of the claims, but that it wished to provide the Trustee with an additional opportunity to demonstrate whether factual issues remained, necessitating a Phase II trial.

On appeal, the Trustee accuses the district court of failing to disclose its intended procedures, suggesting that it was unaware that the court would require it to provide evidence of its claims. The lack of notice purportedly violated the Trustee's due process rights under the Fifth Amendment.

Admittedly, the district court did not unequivocally state that the Trustee had to present the court with evidence necessary to establish that there remained disputed issues of material fact warranting a second phase of the trial. Nonetheless, the order to show cause did specify that the Trustee

had to identify such disputed issues in order to save its claims. Also, the court had announced a tentative conclusion that the Trustee could not meet its burden of proof on these claims, signaling that the Trustee needed to present the court with evidence to meet its burden on each claim. Accordingly, we conclude that under the circumstances presented here, the district court's order provided sufficient notice that the Trustee had to "marshal its proof" and demonstrate the need to proceed to Phase II of the trial. *See, e.g.*, *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000) ("The district court need not anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated.").

Not only was the order sufficient, but there are situational factors that indicate that the Trustee was on notice that it was expected to present evidence in support of its remaining claims. Discovery had closed, motions for summary judgment had been filed and ruled upon, and a trial had concluded. By that stage, the Trustee would have been fully aware of all evidence that supported its claims.

Finally, as will be discussed in more detail below, the district court did not impermissibly rule on disputed fact issues. While it noted the absence of evidence on some elements of the Trustee's claims, it did not resolve factual issues in its conclusions of law. Therefore, we find no error in the district court's case management procedures.

## C. Actual Fraudulent Transfer Claim

The Trustee's complaint alleged that the transactions effectuating the spin-off amounted to fraudulent conveyances, both "actual" (made with intent to hinder, delay, or defraud creditors) and "constructive" (made for less than reasonably equivalent value at a time of the transfer or was rendered insolvent

or undercapitalized).[19] *See, e.g.*, *In re Soza*, 542 F.3d 1060, 1064 (5th Cir. 2008); Tex. Bus. & Com. Code Ann. § 24.005 (West 2013). Given Idearc's solvency at the time of the spin-off, it was clear that the Trustee's constructive fraud claim would fail. However, the Trustee maintained that its actual fraudulent transfer claim would survive; the district court disagreed.

According to the district court, for the Trustee to establish that the transfers Idearc made as part of the spin-off were fraudulent, the Trustee would need to produce evidence to show that Appellees had actual intent to hinder, delay, or defraud a creditor. *See* Conclusions of Law at 5. The district court held that the Trustee had not "presented specific direct evidence of [Appellees'] fraudulent intent, nor has it pointed to any such evidence that it may yet present." *Id.* Additionally, the district court held that the weight of the evidence on intent was negated by the valuation finding. *Id.*

The district court first considered whether the Trustee had proffered direct evidence regarding fraudulent intent, but held that the Trustee had only made general allegations concerning Appellees' intent and that there was no "specific evidence" contained in the "many briefs it has submitted in this case." *Id.* at 5–6. In the absence of any testimony, communications, or other evidence that tended to reveal the state of mind of the Verizon officers, the district court was left to consider whether the Trustee had pointed to circumstantial evidence of intent. *Id.* at 6.

Under Texas law, there are eleven indicators of fraudulent intent, called "badges of fraud." *In re Soza*, 542 F.2d at 1066; Tex. Bus. & Com. Code Ann. § 24.005(b). The Trustee had argued that there was evidence of five of the

---

[19] The Trustee alleged numerous fraudulent transfer claims against Verizon, GTE, and VFS involving various transfers of cash and debt. Aspects of some of the Trustee's fraudulent transfer claims were disposed of during pre-trial motions. The remaining claims were grouped together in the district court's conclusions of law and are discussed collectively on appeal.

eleven badges; however, the district court noted that the factual finding that Idearc was worth at least $12 billion negated two of those badges. Conclusions of Law at 6 (citing Tex. Bus. & Com. Code Ann. §§ 24.005(b)(8) (reasonably equivalent value) & 24.005(b)(9) (solvency)). The remaining three badges were transfer to an insider, concealment, and transfer shortly before a substantial debt was incurred. Tex. Bus. & Com. Code Ann. § 2405(b)(1), (3), & (10). The district court held that because it found that a "plethora of material information relating to the spin[-]off was actually disclosed to the market," the Trustee had not established "concealment." Conclusions of Law at 6. Thus, the only remaining badges were transfer to an insider and transfer shortly before a substantial debt was incurred. The district court explained that these two badges alone could not support a finding of intent in a spin-off since they "are a feature of every spin[-]off transaction that involves debt." *Id.* at 7. Additionally, the district court held "that the presence of so few badges, in such a context, is insufficient as a matter of law to support a finding of actual intent to hinder, delay or defraud." *Id.* (citing *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995); *Tex. Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299, 314 (Tex. App.—El Paso 2009, no pet.)). Thus, it entered judgment in Appellees' favor on the actual fraudulent transfer claims. *Id.*

The Trustee only briefly challenges the district court's determination that it failed to presented specific direct evidence of fraudulent intent by claiming that the court "waded into factual disputes outside the scope of Phase I by making a *sua sponte* determination that there was" insufficient evidence. Notably, the Trustee does not argue that it had presented the district court with any direct evidence of fraudulent intent in its response to the order to show cause. However, the district court did not resolve or decide a factual issue; rather, it noted that Appellees had not provided any direct evidence of

fraud, so it had to consider the available circumstantial evidence. As previously discussed, under the circumstances in this case, the Trustee should have been well aware that it needed to present the district court with any direct evidence of fraud in its response to the order to show cause. Yet, the Trustee failed to do so. The district court's comment that it had not been presented with direct evidence of fraud constitutes an observation of the lack of evidence, which is permissible.

Additionally, the Trustee does not challenge the district court's badge-of-fraud analysis, nor does it claim that there was sufficient circumstantial evidence to create an issue of fact concerning Appellees' intent to defraud. In the absence of such an argument, we affirm the district court's entry of judgment in favor of Appellees on the fraudulent transfer claims.

## D. Breach of Fiduciary Duty Against Diercksen and Aiding and Abetting Against Verizon

Counts Three and Four in the Trustee's amended complaint allege that Diercksen breached his fiduciary duty to Idearc and that Verizon and VFS aided and abetted that breach of fiduciary duty. Following the bench trial, the district court entered judgment in favor of Appellees on these counts, relying in part on its prior ruling that no reasonable factfinder could conclude that Idearc was not Verizon's wholly-owned subsidiary. Conclusions of Law at 16. The Trustee appeals on the grounds that Idearc was not a wholly-owned subsidiary and that the court misapplied Delaware law.

Under Delaware law, a corporate parent owes its wholly-owned subsidiary no fiduciary duties, other than a duty not to take actions that cause it to be unable to meet its legal obligations. *See Anadarko*, 545 A.2d at 1174. Likewise, a director of a wholly-owned subsidiary, such as Diercksen, owes the subsidiary only the duty to manage it in the best interest of the corporate parent so long as the subsidiary is able to meet its legal obligations. *Trenwick*

41

*Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 200–01, 203 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007)).  Since Idearc was solvent on the date of the spin-off, the district court held, "it cannot be argued plausibly that Verizon or Diercksen caused it to be unable to meet its legal obligations."[20]  Conclusions of Law at 8.  It also dismissed the Trustee's "titillating allegations concerning Verizon and Diercksen's conduct in connection with the spin[-]off," commenting that these allegations could not "be said to have *caused* Idearc to be unable to meet legal obligations."  Conclusions of Law at 8–9.

Even if Idearc were not a wholly-owned subsidiary and Diercksen did owe the company fiduciary duties, the district court still believed that the Trustee's breach of fiduciary duty claim would fail.  The district court held that the Trustee had failed to show how the $9 billion in damages sought for this claim was "'logically and reasonable related to the harm' for which compensation is sought."  Conclusions of Law at 9 (quoting *In re J.P. Morgan Chase & Co. S'holder Litig.,* 906 A.2d 766, 774 (Del. 2006)).[21]  The district court found that the Trustee had not explained "how Diercksen's alleged breaches or Verizon's supposed knowledge could possibly have damaged Idearc's creditors

---

[20] The Trustee argues that whether Verizon or Diercksen caused Idearc to fail to meet its duties is an issue of fact that warranted a second phase of trial.  We disagree.  The district court's comments amount to an observation of a lack of evidence on causation.

[21] In *In re J.P Morgan Chase & Co.*, 906 A.2d at 776, the shareholder plaintiffs alleged that J.P. Morgan Chase ("JPMC") overpaid for Bank One, and in so doing, the JPMC directors breached their fiduciary duties, including their duty of disclosure, owed to the shareholders of JPMC.  The shareholders sought $7 billion in damages, which represented the alleged overpayment.  The Delaware Supreme Court explained that the damage amount "ignores the fundamental principle governing entitlement to compensatory damages, which is that the damages must be logically and reasonably related to the harm or injury for which compensation is being awarded."  *Id.* at 773.  Although the alleged damages "would be a logical and reasonable consequence (and measure) of the harm caused to JPMC for being caused to overpay for Bank One, that $7 billion figure has no logical or reasonable relationship to the harm caused to the shareholders *individually* for being deprived of their right to cast an informed vote."  *Id.* (emphasis in original).

(particularly in so great an amount) in light of the court's valuation and solvency findings." Conclusions of Law at 10. Thus, the court entered judgment in Diercksen's favor.

Because a claim for aiding and abetting a breach of fiduciary duty requires a showing of an underlying breach in the fiduciary duty, *see Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172 (Del. 2002), this claim also failed, and the district court entered judgment in Verizon's favor. Conclusions of Law at 10.

Since we have already affirmed the district court's reliance on its summary judgment ruling that Idearc was a wholly-owned subsidiary of Verizon, we move directly to the Trustee's contention that the solvency finding does not "relieve" Diercksen of his fiduciary duties to Idearc. The Trustee contends that Diercksen still had a duty of loyalty to Idearc, which required Diercksen to establish the "entire fairness" of the spin-off in order to show that Diercksen did not breach his duty. However, *Anadarko* expressly rejected such a claim. *Anadarko* noted that "[i]t is a basic principle of Delaware General Corporation Law that directors are subject to the fundamental fiduciary duties of loyalty and disinterestedness. Specifically, directors cannot stand on both sides of the transaction nor derive any personal benefit through self-dealing." 545 A.2d at 1174. Immediately after acknowledging this general rule, the court explained that "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." *Id.* Additionally, *Trenwick*, 906 A.2d at 200, applied the rule in *Anadarko* to a director, explaining that a director does not owe a fiduciary duty to a subsidiary corporation, except to the extent that the director does not cause the corporation to breach its legal duties. Since Idearc was solvent, Diercksen

No. 13-10752

fulfilled any fiduciary duty that he had to Idearc.  Thus, the district court did not need to inquire into the entire fairness of the transaction.

Because we find that the district court properly relied on the solvency finding and its previous finding that Idearc is a wholly-owned subsidiary, we also affirm its judgment in favor of Appellees on the breach of fiduciary duty and aiding and abetting counts.  *See Gotham Partners*, 817 A.2d at 172.

**E. Promoter Liability and Breach of Fiduciary Duty Against Verizon**

In Count Nine of the Trustee's amended complaint for "Promoter Liability and Breach of Fiduciary Duty," the Trustee alleges that Verizon and Diercksen, as promoters of Idearc, owed fiduciary duties to Idearc and that they breached those duties.  ROA 6107–08.  Following the district court's valuation findings, the district court entered judgment in favor of Appellees on these claims.  The Trustee now appeals both the district court's interpretation of the underlying facts and the application of the law with respect to its promoter liability claim against Verizon.

Under Delaware law, the promoters of a corporation have a fiduciary relationship with the corporation itself.  *Gladstone v. Bennett*, 153 A.2d 577, 582 (Del. 1959); *see also Bailes v. Colonial Press, Inc.*, 444 F.2d 1241, 1244 (5th Cir. 1971) ("[P]romoters of a corporation stand in a fiduciary relation to the corporation, charged with the duty of good faith as in cases of other trusts. The fiduciary relation continues until the plan or scheme of promotion has been accomplished.").  As previously explained, a wholly-owned subsidiary generally is not owed fiduciary duties by its corporate parent in the absence of minority shareholders. *See Trenwick*, 906 A.2d at 191–92; *Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F. Supp. 2d 918, 938–39 (W.D. Ky. 2007) (holding that a promoter-parent owed no fiduciary duty to its wholly-owned subsidiary). There is an exception to this rule, under which a parent owes fiduciary duties

44

to a subsidiary when that subsidiary is insolvent. *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101–02 (Del. 2007).

Based on its subsidiary finding during summary judgment and its solvency finding after the bench trial, the district court concluded that this case was "squarely within the holdings articulated in both *Anadarko* . . . and *Westlake Vinyls*." Conclusions of Law at 16. Because Idearc was a wholly-owned subsidiary, Verizon and Diercksen, as promoters, did not owe Idearc fiduciary duties. Since Verizon did not owe Idearc any fiduciary duties, the court also concluded that "judgment should be entered for the defendant on the [Trustee's] promoter liability claim." *Id.* at 17.

Just as it did with the fiduciary duty count and the aiding and abetting count, the district court explained that even if it were to conclude that Idearc was not a wholly-owned subsidiary, the Trustee could not prevail on the promoter claim. According to the district court, the Trustee could not show, in light of the solvency finding, how Idearc or its creditors were damaged by the actions enumerated in the complaint, motions for summary judgment, responses to motions for summary judgment, the proposed findings of fact and conclusions of law, and the joint pretrial order. *Id.* at 19. The district court explained that the Trustee had previously argued that Diercksen and Verizon schemed in the promotion of Idearc to accomplish a tax-free debt-for-debt exchange, which would relieve Verizon of a significant debt burden and load Idearc with debt that it could not support. *Id.* at 20. Thus, the Trustee had claimed that Diercksen and Verizon were liable for the "unsustainable debt with which they saddled Idearc"; however, this theory failed because the district court found that Idearc was not "saddled" with unsupportable debt. *Id.* It was after subsequent events, including the "Great Recession," that Idearc became unable to support its debt, and these "intervening events . . . sever any causal link between Verizon and Diercksen's actions and Idearc's bankruptcy."

*Id.* The district court held that the Trustee had not even attempted to show how, given Idearc's solvency, any damage to Idearc's creditors could be logically related to the alleged breaches of duty by Verizon and Diercksen. Therefore, the district court entered judgment in favor of Verizon on Count Nine.[22]

On appeal, the Trustee again argues that the district court was factually wrong as to its subsidiary finding and that the district court was legally wrong because *Anadarko* does not extinguish the fiduciary duties of a promoter.[23]

Since we previously affirmed the district court on the subsidiary issue, we move to the Trustee's *Anadarko* argument. The Trustee claims *Anadarko* does not apply to this case, arguing that the holding is limited to corporate parents and their wholly-owned subsidiaries, but that here, Verizon is more than a parent—it is a promoter. The Trustee explains that in *Anadarko*, the parent corporation spun-off a subsisting subsidiary that already had a seven-member board and separate legal counsel, making the parent only an owner and not a promoter. In support of its limited approach to *Anadarko*, the Trustee points to language which states that the case should be "confined to its specific facts." 545 A.2d at 1177. Although a federal district court applied *Anadarko* to a parent-promoter in *Westlake Vinyls*, the Trustee claims that *Westlake Vinyls*'s holding is flawed since *Anadarko* did not involve promoters.

---

[22] The Trustee argues that the district court's comment that the Great Recession constituted an intervening even was a finding of fact that warranted a second phase of trial. However, the Trustee mischaracterized the comment. We construe this comment as pointing to a lack of evidence to support causation.

[23] The Trustee also comments that it is entitled to "its day in court" on the promoter liability claim. It explains that the "economic reality" of the spin-off was that "through the unlawful actions of Verizon's officer, Diercksen[,] . . . Verizon helped itself to $2.5 billion in cash and got the full benefit of the $7.1 billion in Idearc debt." Because Idearc had no board, and because the unlawful board paid illegal dividends, the Trustee maintains that it is entitled to a trial on the promoter liability claim. We have previously addressed the issue of a jury trial, as well as the propriety of the procedure used by the district court in addressing the Trustee's claims following the bench trial.

However, it offers no caselaw to suggest that a parent-promoter falls outside the ambit of *Anadarko*.

We disagree with the Trustee, as the distinction between a parent and a parent-promoter is a distinction without a difference. First, Verizon's role as promoter did not change its status as the sole owner of Idearc. Second, the Trustee has not offered any argument for why a parent-promoter should be treated differently than a parent in terms of defining its duties to its wholly-owned subsidiary. Third, the Trustee has not provided any caselaw to support its theory, whereas at least one other court has applied *Anadarko* to a parent-promoter. *See Westlake Vinyls*, 518 F. Supp. 2d at 938–39.

Verizon's role as a promoter does not change the fact that it was the promoter of its own wholly-owned subsidiary. Thus, to the extent Verizon owed duties to Idearc as a promoter, those duties overlapped with the duties it owed its wholly-owned subsidiary, so *Anadarko* applies. Under *Anadarko*, Verizon does not owe Idearc fiduciary duties, so we affirm the judgment of the district court on Count Nine.[24]

**F. Unlawful Dividend**

Count Eight of the amended complaint alleges that Diercksen, as Idearc's sole director, approved an unlawful dividend for the benefit of Verizon,

---

[24] Despite the numerous arguments on this point, the Trustee has failed to challenge the district court's conclusion that, even if Idearc was not a wholly-owned subsidiary and Appellees had breached their fiduciary duties, the Trustee had not shown that the breach resulted in harm to the creditors. *See* Conclusions of Law at 19 (holding that the "problem for [the Trustee]" is that it "cannot show, in light of the court's solvency finding, how Idearc or its creditors were damaged by the specific actions" about which [the Trustee] complained). This was offered as an independent reason for its entry of judgment for Appellees on this count. When an appellant challenges only one of the district court's alternative holdings, any argument that the alterative holding was in error is waived. *See R.R. Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 220 n.3 (5th Cir. 2005). The Trustee waived any challenge to the district court's alternative holding entering judgment in favor of Verizon on Count Nine, so its appeal to Count Nine necessarily fails.

and that both Diercksen and Verizon are liable for an unlawful dividend claim under Delaware law.  The district court entered judgment in Appellees' favor, concluding that Idearc had sufficient surplus to issue a dividend and that its failure to follow corporate formalities was an insufficient basis on which to hold that the dividend was unlawful.[25]  We agree with the district court.

Delaware law permits the directors of a corporation to "declare and pay dividends . . . [from] its surplus . . . or . . . out of its net profits for the fiscal year in which the dividend is declared[.]"  Del. Code Ann. tit. 8, § 170(a).  Delaware law describes the process by which a corporation may declare dividends, and the relevant section begins with the admonition: "No corporation shall pay dividends except in accordance with this chapter."  *Id.* § 173.  Under § 173, "Dividends may be paid in cash, in property, or in shares of the corporation's capital stock."  *Id.*  Directors may be held liable for a "wilful or negligent violation of § 160 or § 173 . . .  to the corporation, and to its creditors in the event of its dissolution or insolvency, to the full amount of the dividend unlawfully paid[.]"  *Id.* § 174.

Delaware law is silent as to whether technical infractions as to the declaration of a dividend are sufficient to render a dividend unlawful.  Similarly, the cases on which the Trustee relies are silent as to whether an unlawful dividend claim may rest on these infractions alone.  The Trustee points to *Pereira v. Cogan*, 294 B.R. 449 (S.D.N.Y 2003), *vacated and remanded*, 413 F.3d 330 (2d Cir. 2005), in support of its proposition that a dividend is illegal when it is not declared by the board in accordance with

---

[25] According to the Trustee, the district court refused to address fact issues relating to the violation of corporate formalities, so judgment was not authorized under Federal Rule of Civil Procedure 52(a).  However, the district court did not address these issues because it proceeded under the assumption that Idearc had not properly observed corporate formalities, but it found that the failure to follow formalities was legally irrelevant.  Thus, the district court did not err.

Delaware law. However, this overstates the holding of *Pereira*, which found that a dividend was illegal because the dividend was not declared by the board in accordance with § 170 *and* it was issued when the corporation was insolvent. *Id.* at 539–40. *Pereira* does not state that the failure of the board to declare a dividend in accordance with § 170 alone was sufficient to warrant a legal remedy.

The Trustee also argues that because the dividend was declared before the spin-off was finalized (and before Idearc had a surplus from which to issue a dividend), the dividend was in violation of Delaware law. Again, the Trustee relies on a case that is not squarely on point.[26] In *Vogtman v. Merchants' Mortgage and Credit Co.*, 178 A. 99, 102 (Del. 1935), the Delaware Supreme Court considered whether a corporation had sufficient surplus to declare a dividend. The court held that "whether a dividend was rightfully made, the transaction must be viewed as of the time when it was *declared.*" *Id.* at 102 (emphasis added). The Trustee relies heavily on this statement, reasoning that, as a matter of law, a dividend is unlawful if there was insufficient surplus on the date it was declared, irrespective of whether there was sufficient surplus on the date on which the dividend was actually paid. However, the actual analysis performed by the *Vogtman* court indicates that the truly relevant inquiry is whether the surplus existed on the date of payment. Notably, the opinion does not state the date on which the dividend was declared. Rather, the court extensively reviews the corporation's balance sheet as of December 31, 1932, the day immediately prior to the payment of the dividend. *Id.* at 102–03. The court held that the dividend was to be "disregarded" because there were insufficient assets from which to pay the dividend on the day before the

---

[26] Idearc declared the dividend on October 31, 2006. At that time, Idearc had no assets, since the spin-off (and thus the transfers of property from Verizon to Idearc) did not occur until November 17, 2006.

dividend was paid. *Id.* at 103. Given the fact that *Vogtman* was ultimately concerned with the state of the company's balance sheet immediately prior to the payment of the dividend, we reject the Trustee's contention that *Vogtman* requires that the surplus be available on the precise date it is declared. Since there was undoubtedly sufficient surplus on the date the dividend was paid, we find that the requirements in *Vogtman* have been satisfied.

The Trustee's final argument is that the dividend was illegal because Idearc's board did not determine whether a surplus actually existed prior to declaring the dividend.[27] It attacks the district court's reliance on *Klang v. Smith's Food and Drug Centers, Inc.*, 702 A.2d 150, 152, 156 (Del. 1997), for the proposition that "perfection in [the] process [of revaluing assets] is not required," and that "[a] mistake in documenting [a] surplus will not negate the substance of the action, which complies with the statutory scheme." However, additional caselaw suggests that a violation of corporate formalities when issuing a dividend is not enough to substantiate a tort claim when there was in fact sufficient surplus for the dividend, thus indicating that the district court's interpretation of *Klang* is likely correct.

In *Paramount-Richards Theatres, Inc. v. Commissioner of Internal Revenue*, 153 F.2d 602 (5th Cir. 1946), this court reviewed the decision of a tax court denying deductions claimed by a Delaware corporation and two shareholders. *Id.* In addressing the tax issue, *Paramount-Richards* considered whether dividends were issued, concluding,

> Corporate earnings may constitute a dividend notwithstanding that the formalities of a dividend declaration are not observed; that the distribution is not recorded on the corporate books as such;

---

[27] In support of this argument, the Trustee cites a lone statement from Diercksen's deposition testimony. ROA 27687. Diercksen was asked if he had ever "tried to ascertain whether there was adequate capital and surplus with which to declare such a dividend," and he responded in the negative. *Id.* Diercksen them immediately asked if the Trustee's attorney could repeat the question because he thought he "answered it way too fast." *Id.*

that it is not in proportion to stockholdings, or even that some of
the stockholders do not participate in its benefits.

*Id.* at 604; *see also* Fletcher Cyclopedia of the Law of Corporations § 5350 (West 2011) ("Courts have recognized . . . that a distribution to shareholders may amount to a legal dividend without formal vote and resolution of directors, even though it was not designated as a dividend by the directors." (citing numerous non-Delaware cases) (internal footnote omitted)).  Given that this court has acknowledged that a corporation can declare a dividend without observing formalities, it would be counterintuitive to simultaneously require strict adherence to those formalities to avoid liability for allegedly unlawful dividends when there was sufficient surplus to fund the dividends.

Such an interpretation of *Paramount-Richards* is consistent with the Delaware Supreme Court's statements in *Klang*.  Although *Klang* is distinguishable in that the board of directors there did perform some investigation into the corporation's available assets, the court still spoke generally about the need to consider the underlying purpose of Delaware law when applying it to corporate transactions.  *See* 702 A.2d at 152, 154.  This functional approach coincides with *Paramount-Richards*'s "constructive" dividend holding.  Delaware law is written to prevent the payment of a dividend when there are insufficient funds; here, Idearc was solvent, so the dividend did not violate the purpose of the law.  Accordingly, we affirm the district court's decision with respect to the unlawful dividend claim.

**G. Alter Ego**

Count Eleven of the amended complaint for alter ego alleges that the court should "pierce Idearc's corporate veil and hold Verizon liable for all of Idearc's debts, including all debt and other obligations incurred by Idearc in connection with or because of the [s]pin-off."  Before the trial, the district court had explained that "alter ego" is not a separate cause of action but a remedy to

enforce a substantive right. *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 3:10-CV-1842-G, 2012 WL 3100778, at *16 (N.D. Tex. July 31, 2012) (citing *Western Oil & Gas JV, Inc. v. Griffiths*, 91 F. App'x 901, 903–04 (5th Cir. 2003) (unpublished); *In re Grothues*, 226 F.3d 334, 337 (5th Cir. 2000)).  In its order granting in part and denying in part the motion to dismiss, the district court did not dismiss the alter ego claim to the extent that it could be used as a theory of recovery on the other claims. *Id.*  At summary judgment, the district court again stated that it had "already dismissed the plaintiff's alter ego claim, but only to the extent that it is pled as a separate cause of action." *U.S. Bank (Summary Judgment)*, 892 F. Supp. 2d at 829.  Following the bench trial, the court necessarily found that the alter ego claim failed since the Trustee had not prevailed on any of the other claims.  Conclusions of Law at 21.

According to the Trustee, "regardless of whether the alter ego is a 'claim' or a 'remedy,' the district court's dismissal was improper in the bankruptcy context" because the Trustee is empowered to sue Verizon based on the underlying claims of the creditors.  The Trustee argues that the alter ego claim was independent of a valuation determination and that it should be tried before a jury.  However, under Texas law, while alter ego theory is a means to pierce the corporate veil, it still relies on an underlying claim. *In re Grothues*, 226 F.3d at 337–38.  Since we affirm the district court's entry of judgment in favor of Appellees on the other claims, we affirm the district court on the alter ego claim.

## VII.   Moot Issues (Motion to Dismiss and Summary Judgment)

The Trustee also appeals aspects of the district court's orders on dispositive motions.  Specifically, the Trustee challenges the dismissal of its unjust enrichment claim; the dismissal of its fraudulent transfer claims with respect to the Unsecured Notes and Tranche B debt; the entry of summary judgment in Appellees' favor on the fraudulent transfer and unlawful dividend

claims relating to the transfer of $2.5 billion in cash from Idearc to Verizon; and the summary judgment ruling limiting the Trustee's potential recovery on the breach of fiduciary duty claim. Appellees argued that these issues are moot in their response brief, since any error at the motion to dismiss and summary judgment stage would be harmless based upon the district court's findings of fact and conclusions of law. The Trustee did not refute this point in its reply brief.

We agree that these claims are moot. First, because the district court found that Idearc received reasonably equivalent value for the cash it transferred and the debt issued to Verizon, the Trustee's unjust enrichment claim would have failed on the merits even if it survived the motion to dismiss. Second, the district court found that the Trustee could not demonstrate the necessary fraudulent intent in order to establish actual fraudulent transfer, and the solvency finding barred recovery for constructive fraudulent transfer; thus, it is moot that the district court disposed of some of the fraudulent transfer claims. Third, the district court entered judgment in favor of Appellees on the breach of fiduciary duty claim, so any limitations on the Trustee's potential recovery are irrelevant. Since these issues are moot, we will not consider the merits of the Trustee's arguments.

## VIII. Conclusion

We find no reversible error in the district court's case management decisions, factual findings, and legal conclusions. Accordingly, we AFFIRM the judgment of the district court.