# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 30, 2024

Lyle W. Cayce
Clerk

———————

No. 23-10333

———————

Balboa Capital Corporation, *a California Corporation*,

*Plaintiff—Appellant*,

*versus*

Okoji Home Visits MHT, L.L.C., *a Maryland limited liability company*; ULNACS Medical Care PC, *a Maryland Corporation*; Godswill Okoji, *an individual*; Does, 1 through 10, *inclusive*; Patel Transitions MHT, L.L.C., *a Georgia limited liability company*; Doctor Jaideep Patel, *an individual*; Shafie Transitions MHT, L.L.C., *a Texas limited liability company*; El Sherif Omar Shafie, *an individual*, named as El Sherif Shafie in the Complaint; Butt Transitions MHT, L.L.C., *a Georgia limited liability company*; Zaigham Butt, *an individual*; Johnston Transitions MHT, L.L.C., *a Tennessee limited liability company*; Chambless Johnston, *an individual* Erroneously Sued As Chambless Johnson; Thi Transitions MHT, L.L.C., *a Texas limited liability company*; Vu Thi, *an individual*; Woldegiorgis Transitions MHT, L.L.C., *a Texas limited liability company*; Hailegiorgis Woldegiorgis, *an individual*; Siddiqui Transitions MHT, L.L.C.; ASF Siddiqui MD, Limited, *a Nevada Corporation*; Abdul Siddiqui, *an individual*; Ortega Home Visits MHT, L.L.C., *a Texas limited liability company*; Scotty Ortega, *an individual*; Las Vegas Transitions MHT, L.L.C., *a Nevada limited liability company*; Sushil Patel, Erroneously Sued As Sunshil Patel; Fadi Daoud El-Salibi, *an individual*; El-Salibi Transitions MHT, L.L.C., *a Nevada limited liability company*; El-Salibi Infectious Diseases of Southern Nevada, *a Nevada limited liability company*; Poku

HOME VISITS MHT, L.L.C., *a Maryland limited liability company*; CEDRIC POKU-DANKWAH MD, A BUSINESS ENTITY OF UNKNOWN FORM; CEDRIC POKU-DANKWAH, *an individual*; OPAIGBEOGU MHT, L.L.C., *a Maryland limited liability company*; UCHECHI OPAIGBEOGU, *an individual*; SOZI TRANSITIONS MHT, L.L.C., *a Texas limited liability company*; LOVE NAKANDI SOZI, *an individual*; DOCTOR NHUE HO HOME VISITS, L.L.C., *a Texas limited liability company*; NHUE HO MD, P.L.L.C., A BUSINESS ENTITY OF UNKNOWN FORM; NHUE HO, *an individual*; IMRAN TRANSITIONS MHT, L.L.C., *an Arkansas limited liability company*; TABASUM IMRAN, *an individual*; OSTROWSKY HOME VISITS MHT, L.L.C.; AVI A OSTROWSKY MD LIMITED; AVI OSTROWSKY; WAHAB TRANSITIONS MHT, L.L.C.; NAZ WAHAB; NAZ WAHAB M.D., P.C.; SAGHIR TRANSITIONS MHT, L.L.C.; SHEIKH S SAGHIR PROFESSIONAL LIMITED LIABILITY COMPANY; SHEIKH SAGHIR; SAMUEL FENG,

*Defendants—Appellees*,

—————————————————————

BALBOA CAPITAL CORPORATION, *a California corporation*,

*Plaintiff—Appellant*,

*versus*

SHAFIE TRANSITIONS MHT, L.L.C., *a Texas limited liability company*; EL SHERIF OMAR SHAFIE, *an individual*, NAMED AS EL SHERIF SHAFIE IN THE COMPLAINT; DOES, 1 THROUGH 10, *inclusive*,

*Defendants—Appellees*,

—————————————————————

BALBOA CAPITAL CORPORATION, *a California corporation*,

*Plaintiff—Appellant*,

*versus*

BUTT TRANSITIONS MHT, L.L.C., *a Georgia limited liability company*; ZAIGHAM BUTT, *an individual*; DOES, 1 THROUGH 10, *inclusive*,

*Defendants—Appellees*,

_____

BALBOA CAPITAL CORPORATION, *a California corporation*,

*Plaintiff—Appellant*,

*versus*

PATEL TRANSITIONS MHT, L.L.C., *a Georgia limited liability company*; DOCTOR JAIDEEP PATEL, *an individual*; DOES, 1 THROUGH 10, *inclusive*,

*Defendants—Appellees*,

_____

BALBOA CAPITAL CORPORATION, *a California corporation*,

*Plaintiff—Appellant*,

*versus*

THI TRANSITIONS MHT, L.L.C., *a Texas limited liability company*; VU THI, *an individual*; DOES, 1 THROUGH 10, *inclusive*,

*Defendants—Appellees*,

_____

BALBOA CAPITAL CORPORATION, *a California corporation*,

*Plaintiff—Appellant*,

*versus*

WOLDEGIORGIS TRANSITIONS MHT, L.L.C., *a Texas limited liability company*; HAILEGIORGIS WOLDEGIORGIS, *an individual*; DOES, 1 THROUGH 10, *inclusive*,

*Defendants—Appellees*,

_____

BALBOA CAPITAL CORPORATION,

*Plaintiff—Appellant*,

*versus*

SIDDIQUI TRANSITIONS MHT, L.L.C.; ABDUL SIDDIQUI, *an individual*; DOES, 1 THROUGH 10, *inclusive*; SIDDIQUI MD, LIMITED,

*Defendants—Appellees*,

_____

BALBOA CAPITAL CORPORATION, *a California corporation*,

*Plaintiff—Appellant*,

*versus*

ORTEGA HOME VISITS MHT, L.L.C., *a Texas limited liability company*; SCOTTY ORTEGA, *an individual*; DOES, 1 THROUGH 10, *inclusive*,

*Defendants—Appellees*,

_____

BALBOA CAPITAL CORPORATION, *a California corporation*,

*Plaintiff—Appellant*,

*versus*

LAS VEGAS TRANSITIONS MHT, L.L.C., *a Nevada limited liability company*; SUSHIL PATEL, *an individual*; DOES 1 THROUGH 10, *inclusive*,

*Defendants—Appellees*,

_____

BALBOA CAPITAL CORPORATION, *a California corporation*,

*Plaintiff—Appellant*,

*versus*

FADI DAOUD EL-SALIBI, *an individual*; EL-SALIBI TRANSITIONS MHT, L.L.C., *a Nevada limited liability company*; EL-SALIBI INFECTIOUS DISEASES OF SOUTHERN NEVADA, *a Nevada limited liability company*; DOES, 1 THROUGH 100, *inclusive*,

*Defendants—Appellees*,

_____

BALBOA CAPITAL CORPORATION, *a California corporation*,

*Plaintiff—Appellant*,

*versus*

POKU HOME VISITS MHT, L.L.C., *a Maryland limited liability company*; CEDRIC POKU-DANKWAH, MD, A BUSINESS ENTITY OF UNKNOWN FORM; CEDRIC POKU-DANKWAH, *an individual*; DOES 1 THROUGH 100, *inclusive*,

*Defendants—Appellees,*

_____

BALBOA CAPITAL CORPORATION, *a California corporation,*

*Plaintiff—Appellant,*

*versus*

OPAIGBEOGU MHT, L.L.C., *a Maryland limited liability company*; UCHECHI OPAIGBEOGU, *an individual*; DOES, 1 THROUGH 100, *inclusive,*

*Defendants—Appellees,*

_____

BALBOA CAPITAL CORPORATION, *a California corporation,*

*Plaintiff—Appellant,*

*versus*

SOZI TRANSITIONS MHT, L.L.C., *a Texas limited liability company*; LOVE NAKANDI SOZI, *an individual*; DOES, 1 THROUGH 10, *inclusive,*

*Defendants—Appellees,*

_____

BALBOA CAPITAL CORPORATION, *a California corporation,*

*Plaintiff—Appellant,*

*versus*

IMRAN TRANSITIONS MHT, L.L.C., *an Arkansas limited liability company*; TABASUM IMRAN, *an individual*; DOES, 1 THROUGH 10, *inclusive*,

*Defendants—Appellees*,

_____

BALBOA CAPITAL CORPORATION, *a California Corporation*,

*Plaintiff—Appellant*,

*versus*

WAHAB TRANSITIONS MHT, L.L.C., *a Nevada limited liability company*; NAZ WAHAB M.D., P.C., *a Nevada corporation*; NAZ WAHAB, *an individual*,

*Defendants—Appellees*,

_____

BALBOA CAPITAL CORPORATION, *a California Corporation*,

*Plaintiff—Appellant*,

*versus*

SAGHIR TRANSITIONS MHT, L.L.C., *a Nevada limited liability company*; SHEIKH S. SAGHIR PROFESSIONAL LIMITED LIABILITY COMPANY, *a Nevada limited liability company*; SHEIKH SAGHIR,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC Nos. 3:18-CV-1949, 3:18-CV-1950,

3:18-CV-898, 3:18-CV-900, 3:18-CV-901,
3:18-CV-902, 3:18-CV-904, 3:18-CV-907,
3:18-CV-908, 3:18-CV-909, 3:18-CV-910,
3:18-CV-916, 3:18-CV-917, 3:18-CV-918,
3:18-CV-919, 3:18-CV-921

_____

Before RICHMAN, *Chief Judge*, and GRAVES and WILSON, *Circuit Judges*.
CORY T. WILSON, *Circuit Judge*:

This appeal sets victims of a Ponzi scheme against each other to determine who bears the financial losses from the fraud perpetrated upon them by the schemer. The district court resolved this dispute through two rulings, both of which are now before us on appeal. First, the district court struck an evidentiary exhibit that spliced certain invoices with separate payment agreements and presented them as unitary "business records." Second, the district court determined that the payment agreements, shorn of the extraneous invoices, did not constitute valid contracts between the parties. Upon reviewing the evidentiary ruling for abuse of discretion and the resulting summary judgment *de novo*, we affirm.

## I.

## A.

Plaintiff-Appellant Balboa Capital Corporation (Balboa) is a financing company that does business with small enterprises. Defendants-Appellees are various licensed physicians (the Physicians) practicing in Nevada, Arkansas, Georgia, Maryland, or Texas.[1] Both Balboa and the Physicians are

_____

[1] The Nevada Physicians are represented in this appeal by Ferguson Braswell Fraser Kubasta PC. The other Physicians are represented in this appeal by Hall Griffin LLP. Aside from this distinction in representation, the Physicians' relevant arguments are nearly identical.

victims of a Ponzi scheme orchestrated by America's Medical Home Team (MHT).

MHT positioned itself as a software and services company that operated a program to help doctors establish telehealth medical practices. In theory, the Physicians could participate in this program (the MHT Program) and remotely supervise nurse practitioners who made in-person home visits to Medicare patients under their care. Under this structure, MHT proposed to provide the Physicians with software, hardware, and operational assistance as part of a $76,500 bundle (an MHT License). Each MHT License purportedly corresponded to one nurse practitioner that a given Physician would supervise, and the Physicians purchased between one to four MHT Licenses each. The MHT Program thus involved significant up-front capital investments. Cue Balboa, which financed the "licensing" costs by paying lump sums directly to MHT and entering agreements for monthly repayments from the Physicians—who did not necessarily know these particulars.

But the whole operation was a sham. MHT never delivered anything of value to the Physicians and instead used Balboa's money to pay off its debts to its prior financer and perpetuate the scheme. All the while, MHT kept Balboa and the Physicians in the dark by serving as middleman and weaving a complicated web of obfuscations.

On the Physicians' side, MHT set up single-member limited liability companies (Physician LLCs)[2] for each Physician as part of the MHT

_____

[2] The Physician LLCs are also defendants in this consolidated appeal. However, the Physicians were the sole members of their respective Physician LLCs, and the Physicians personally guaranteed the Physician LLCs' debts to Balboa, so this opinion generally refers to the appellees collectively as "the Physicians" due to their identity of interests.

Program.  MHT then secured operational control of the newly created Physician LLCs by executing management agreements with them.  Because MHT monopolized control of the day-to-day details of the MHT Program, MHT was able thoroughly to deceive the Physicians.  For example, the Physicians testified that they believed the MHT Program required a monthly subscription fee, not an upfront cash payment.  The Physicians also thought—based on MHT's representations—that the monthly fees for the MHT Program would be paid by incoming profits rather than out of their own pockets, or by MHT itself should there be a deficiency.  Further, the Physicians believed they could withdraw from the MHT Program any time without any debt or other obligations because MHT would simply resell their MHT Licenses.

MHT's fraud was equally pervasive as to Balboa.  For instance, MHT regularly sent Balboa photos of individual Physicians next to iPad boxes as proof of delivery, even though the boxes were empty.  This ruse succeeded because Balboa and the Physicians primarily corresponded with each other indirectly through MHT.  MHT also set the documentation and financing guidelines for the MHT Program, and it required Balboa to adopt those practices when Balboa became the MHT Program's primary financer.  These practices involved boilerplate payment agreements (Payment Agreements) between Balboa and the Physicians, along with bespoke invoices (Invoices) for each MHT License purchased.

The Payment Agreements took one of two forms.  Some Physicians signed Monthly Payment Agreements (MPAs), and others signed Installment Payment Agreements (IPAs).[3]  In either format, the Payment

---

[3] The MPAs were used from mid-October 2016 to late November 2016.  They were then replaced by the IPAs, which were used from late November 2016 to February 2017.

Agreements delineated only the payment schedule and the amount of the individual payments. Neither the MPAs nor the IPAs included the total amount financed or information about the cost of Balboa's financing.[4] Instead, the MPAs reference an "Exhibit 'A1'" as the source of equipment details:

> **Equipment Supplier and Description:** See Exhibit "A1" Invoices or Schedules for description of Equipment and Supplier ("Equipment")[.]

Similarly, the IPAs stated the following:

> **SOFTWARE DESCRIPTION:** See Exhibit "A1" Invoices or Schedules for description of Equipment and Supplier[.]

The MPAs included a line for Physicians to initial underneath its reference, while the IPAs did not—the only noteworthy distinction between the Payment Agreements.

Each Invoice lists the $76,500 price for an MHT License, but the Invoices do not break down the cost of Balboa's financing. Also, each Invoice pertains to a single MHT License, so there is no integrated document that states a total purchase price to reflect when Physicians bought multiple MHT

---

[4] Throughout the briefing, the parties occasionally describe Balboa's financing of the MHT Licenses as offering loans to the Physicians, while also mentioning the applicable interest rate, or lack thereof. This terminology—though imprecise—can be conceptually helpful, and it often aligns with the language of analogous California precedent. *See, e.g., Kruse v. Bank of Am.*, 248 Cal. Rptr. 217, 230 (Cal. Ct. App. 1988) (referring to the "rate of interest" as an essential term of a loan agreement). Indeed, "[c]onventional interest charges fall squarely within the definition of [a] finance charge" under California law. *Raceway Ford Cases*, 385 P.3d 397, 404 (Cal. 2016). Nevertheless, because Balboa provided financing—rather than a loan or a line of credit—to the Physicians, we refer to the total amount financed and the cost of financing, instead of loan amounts and interest rates, respectively.

Licenses. Balboa did not generate the Invoices; MHT did. Nevertheless, Balboa maintains that these Invoices are the same documents referenced in the Payment Agreements as "Exhibit 'A1,'" despite the fact that the Invoices lack such a label.

The record is not clear about the role the Invoices played during contract negotiations between the Physicians, MHT, and Balboa. Balboa's declarants assert that MHT contemporaneously presented the Invoices to the Physicians when the corresponding Payment Agreements were executed. But there is competing testimony from at least one Physician that he never saw the Invoices when he signed his Payment Agreement. And because the Physicians never signed the Invoices, there is no definitive proof that the Physicians ever knew of them. Moreover, Balboa concedes that the Invoices were not in the welcome packet it sent to each Physician as a new customer; that packet only included executed documents such as the Payment Agreements and the personal guarantees that the Physicians signed.

The lack of meaningful dialogue between Balboa and the Physicians over the Invoices was never remedied. Once the Physicians signed the Payment Agreements, Balboa contends that it called the Physicians directly to confirm the details of each transaction before disbursing funds to MHT. But the Balboa representative making the calls did not understand the MHT Program, and these calls were inconsistently documented, lasted less than five minutes, and did not become part of Balboa's standard procedures until around April 2017. Yet these calls represent the only direct contact between Balboa and the Physicians.

After the Payment Agreements were signed and the confirmatory phone calls purportedly took place, Balboa transferred lump sums to MHT for the balances due from each of the Physicians. Because MHT often subscribed the Physicians to four $76,500 MHT Licenses, this figure

regularly amounted to more than $300,000 per Physician. When Balboa sued the Physicians, these figures allegedly came as a shock to many of them, who asserted they did not realize they had purchased multiple MHT Licenses—and that Balboa had paid the full cost upfront. Balboa contends that it disbursed approximately $5,000,000 to MHT on behalf of the Physicians over the course of MHT's scheme.

## B.

The Ponzi scheme began to unravel in the spring of 2017, when MHT's financial straits became public and MHT cancelled its existing contracts. Shortly after, MHT declared bankruptcy. Next, the Physicians defaulted on their payments to Balboa.[5] Balboa subsequently sued the Physicians to recover, asserting claims for breach of contract and breach of guarantee based on its theory that the Physicians violated their repayment obligations documented in the Payment Agreements and Invoices.

Balboa initially filed multiple collections actions in California state court. Those actions were removed to federal court based on diversity jurisdiction and then transferred to Judge Barbara Lynn of the United States District Court for the Northern District of Texas, who already had experience with the underlying facts through a class action lawsuit involving the MHT Program. *See, e.g.*, *Melby v. America's MHT, Inc.*, No. 3:17-cv-00155-M (N.D. Tex. filed Jan. 17, 2017). After the California cases were

---

[5] It is not clear whether the Physicians ever paid any installments. The Nevada Physicians assert that MHT made initial payments on their behalf before its collapse. The other Physicians vaguely assert that "monthly payments due to Balboa would be made by MHT on behalf of the Physician LLC's" and that the Physicians themselves did not pay "[i]n light of" the Ponzi scheme. And Balboa contends the Physicians never paid any installments. The record does not resolve these disagreements, but all parties accept that Balboa eventually ceased receiving installment payments, to the extent it ever received them from any source.

transferred, Balboa filed additional collections actions directly in the Northern District of Texas.

The district court ultimately consolidated Balboa's collections actions, and after several years of litigation, the parties filed cross motions for summary judgment. The Physicians also filed motions to strike in the consolidated cases.[6] Those motions targeted the declarations proffered by Patrick Byrne, the Chief Executive Officer of Balboa (the Byrne Declaration), and Robert Rasmussen, Balboa's Chief Operating Officer and Chief Risk Officer (the Rasmussen Declaration), along with the Payment Agreements and Invoices attached to those declarations as "Exhibit C." These exhibits constitute the only place in the record where the Payment Agreements and the Invoices are presented together as unitary documents.

In March 2022, the district court held oral argument on the pending motions. Following this hearing, the district court granted the Physicians' motions to strike portions of Balboa's declarations, including the entirety of the annexed Exhibit C, in each case.[7] Because the declarations are so similar in relevant part, the district court addressed them together:

> The Declarations do not state that the invoices were or are attached to the MPA, or even that the invoices were attached to the MPA in Balboa's files. In addition, the MPA and the invoices are not sequentially Bates numbered, and the invoices are not marked "Exhibit A1," as referenced in the MPA, and

---

[6] The record for this appeal contains over 215,000 pages. The vast majority, however, are essentially duplicates. The district court ordered each document in the consolidated action to be filed in the lead case, *Balboa Capital Corp. v. Okoji Home Visits MHT LLC*, No. 3:18-cv-00898-M (N.D. Tex. removed June 20, 2017), as well as in its own case. The cases are all substantively identical, so most of the documents in the record simply substitute the names of the Physicians and the Physician LLCs.

[7] The district court also denied Balboa's motions for summary judgment. That ruling is not at issue in this appeal.

do not themselves reference the MPA. In addition, the Byrne and Rasmussen Declarations lack any basis indicating that the respective declarant has or could have personal knowledge that those invoices included as Exhibit C to the Declarations are the invoices referenced as Exhibit A1 to the MPA.

After this ruling, the district court granted the Physicians' motions for summary judgment. A year later, in March 2023, the district court issued an opinion explaining its decision to grant the Physicians' motions for summary judgment. The district court then entered final judgment, and Balboa timely appealed.

## II.

"An appeal of a summary judgment presenting evidentiary issues raises two levels of inquiry." *Ratliff v. Aransas County*, 948 F.3d 281, 286 (5th Cir. 2020) (alteration accepted) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 (5th Cir. 1992)). "First, we review the district court's evidentiary rulings for abuse of discretion." *Id.*; *see also U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 430 (5th Cir. 2014). "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Certain Underwriters at Lloyd's, London v. Axon Pressure Prod., Inc.*, 951 F.3d 248, 256 (5th Cir. 2020) (citation omitted).

Once the summary judgment record is defined, "we review *de novo* whether summary judgment was appropriately granted." *Ratliff*, 948 F.3d at 286. "Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Advanced Indicator and Mfg., Inc. v. Acadia Ins. Co.*, 50 F.4th 469, 475 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)). We apply the same standard as the district court and view the evidence in the light most favorable to the nonmoving party. *Id.* A genuine dispute of material fact exists if a

reasonable jury could enter a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Am. Fam. Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 896 (5th Cir. 2013).

## III.

### A.

The district court's decision to strike Balboa's declarations' Exhibit C from the summary judgment record effectively meant excising the Invoices from the Payment Agreements. On substance, the district court declined to read the Payment Agreements in concert with the Invoices as unitary contractual documents. Arguing against this decision, Balboa contends that the district court used the wrong legal standard and that its application of the Federal Rules of Evidence constituted an abuse of discretion. The first argument is forfeited, and the second is unpersuasive.

### 1.

At the summary judgment stage, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); *see also Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017), *as revised*, (July 5, 2017). But "materials cited to support or dispute a fact need only be *capable* of being presented in a form that would be admissible in evidence." *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017) (emphasis original and internal quotations omitted) (quoting *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016)). Thus, "a precondition for considering evidence in an improper form . . . [is] that the 'the party submitting the evidence [must] show that it will be possible to put the information . . . into an admissible form.'" *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 521–22 (5th Cir. 2021) (second brackets and ellipses in original) (quoting *Lee*, 859 F.3d at 355).

No. 23-10333

Based on these standards, Balboa argues that the district court failed to consider whether the documents comprising Exhibit C could be capable of admission at trial. However, as the Physicians point out, Balboa never previously suggested alternate ways by which the Invoices might be admitted at trial; neither Balboa's responses to the Physicians' motions to strike nor its argument before the district court included such an assertion. And the district court did not err by failing to determine *sua sponte* whether Exhibit C was capable of admission in a different form. Insofar as Balboa now tries belatedly to suggest that it could call other witnesses or introduce new facts to ensure the admissibility of Exhibit C, such new arguments are forfeited. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397–98 (5th Cir. 2021).[8]

**2.**

Balboa's second evidentiary argument, properly before us, is that Exhibit C—which pairs MPAs and IPAs with purportedly corresponding Invoices—is admissible in its present form as an attachment to the Byrne and Rasmussen Declarations.[9] The district court generally "agree[d]" with the

---

[8] Even if Exhibit C was capable of admission based on Balboa's forfeited argument, the Payment Agreements and the Invoices still lack the requisite elements for contract formation under California law when considered together, leaving our ultimate disposition unchanged. *See infra* III.B.

[9] For reference, the disputed excerpt of the Byrne Declaration states:

Balboa received MPA No. 248978-000, signed by Godswill Okoji and dated November 17, 2016. Attached hereto as **Exhibit C** are true and correct copies of MPA No. 248978-000, including the invoices referenced as Exhibit A1 therein, which Balboa retained in its records.

The relevant passage from the Rasmussen Declaration similarly states:

Balboa received MPA No. 249046-000, signed by Naz Wahab and dated November 16, 2016, which Balboa counter-signed on November 17, 2016. Attached hereto as **Exhibit C** is a true and correct copy of MPA No.

17

No. 23-10333

Physicians' objections that the Invoices "are not relevant, are not based upon the declarant's personal knowledge, are not properly authenticated, and constitute impermissible hearsay." Without specifically citing them, the district court's order implicates several Federal Rules of Evidence. *See* FED. R. EVID. 401 (relevant evidence), 803 (hearsay exceptions), 901 (evidence authentication).[10] The parties engage on each of these issues, but we decline to reverse the district court on any of them.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401. Balboa's position that the parties entered into enforceable contracts is perhaps more tenable if the Payment Agreements and Invoices are coupled, as Balboa offered in Exhibit C. Similarly, the precise nature of the parties' alleged contracts—as depicted in Exhibit C's paired Payment Agreements and Invoices—is quite important to the ultimate question of liability. For these reasons, Balboa is correct that Exhibit C hurdles Rule 401, and it would be

---

249046-000, including the invoices referenced as Exhibit A1 therein, which Balboa retained in its records.

[10] Under the *Erie* doctrine, a federal court adjudicating a claim arising out of state law applies state substantive law and federal procedural law so as to discourage forum shopping and avoid inequitable administration of the law. *Cf. Erie Railroad v. Tompkins*, 304 U.S. 64 (1938). The Fifth Circuit historically treats the Federal Rules of Evidence as procedural rules. *See Washington v. Dep't of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993). That said, when a state evidentiary rule is so bound up or intertwined with a litigant's substantive rights, it may be appropriate to apply state law in place of the federal evidentiary standard. *Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1047–48 (5th Cir. 1990) (citing *Byrd v. Blue Ridge Electrical Corp.*, 356 U.S. 525, 536 (1958), and *Conway v. Chemical Leaman Tank Lines, Inc.*, 540 F.2d 837, 839 (5th Cir. 1976)).

None of the parties discuss these choice of law issues in the context of the district court's evidentiary ruling, even though they agree that California substantive law applies to the summary judgment inquiry. Accordingly, we follow the default rule and apply the Federal Rules of Evidence to the evidentiary analysis.

error to find otherwise.  However, to the extent the district court actually erred on this point, its decision to strike Exhibit C is supportable on other grounds.  *Cf. Campos*, 10 F.4th at 520 ("We may affirm a summary judgment on any ground supported by the record." (citation omitted)).  Thus, we decline to reverse the district court based upon its assessment, or lack thereof, of Exhibit C's relevancy.

One reason is that Balboa's declarants lack personal knowledge to authenticate Exhibit C.  Rule 901 allows a witness with knowledge to authenticate an item of evidence by offering "[t]estimony that an item is what it is claimed to be."  FED. R. EVID. 901(b)(1).  This is a "low" standard, and the proffering witness "need not be a document's author to authenticate it for purposes of Rule 901."  *Weinhoffer v. Davie Shoring, Inc.*, 23 F.4th 579, 582 (5th Cir. 2022) (citing *United States v. Duncan*, 919 F.2d 981, 986 (5th Cir. 1990)).  Nevertheless, the witness must have at least some "direct knowledge of the source" to authenticate a document. *Id.* (quoting *Thompson v. Bank of America Nat'l Ass'n*, 783 F.3d 1022, 1027 (5th Cir. 2015) (discussing Rule 901 in the context of documents obtained from an online or electronic source); *cf.* FED. R. EVID. 602 ("A witness may testify to a matter only if . . . the witness has personal knowledge of the matter.").

Neither Byrne nor Rasmussen proffers any personal knowledge about the creation of the documents comprising Exhibit C.  Specifically, their testimony lacks any showing of personal knowledge regarding whether the Payment Agreements and Invoices were ever paired together as depicted in Exhibit C, whether the Invoices were "Exhibit 'A1'" as Balboa contends, or whether the Physicians ever even saw the Invoices, much less agreed to their terms.  Because of this, Byrne and Rasmussen fail properly to authenticate the components of Exhibit C as unified contractual documents under Rule 901.

In like manner, Exhibit C is not admissible under the business records exception to the general rule against hearsay. That exception provides that a record is admissible if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

FED. R. EVID. 803(6). Because this list is framed conjunctively, each of the five elements must be satisfied for the exception to vest.

The trouble for Balboa is that Exhibit C fails at step one, as neither witness can properly attest that "the record was made at or near the time [of the parties' purported agreements] by . . . someone with knowledge." *Id.* 803(6)(A). In fact, both declarants assert that MHT—not Balboa—prepared the Invoices and ostensibly provided them to the Physicians with the Payment Agreements. But the declarants can only guess when MHT created the Invoices, who within MHT did so, and, critically, whether MHT ever presented the Invoices to the Physicians, much less as contemporaneous adjuncts to the MPAs and IPAs.

Point being, even if the Invoices accurately reflect the transactions in question, Balboa's declarants aver no personal knowledge that ties them to

the Payment Agreements, as "Exhibit 'A1'" or otherwise. And what the witnesses do say calls into question whether the other elements of Rule 803(6)(B)–(E) can be met. Mindful that Exhibit C is the only proffered evidence that ties the Payment Agreements and the Invoices together as *single* business records, the disconnect between the declarants' knowledge and Exhibit C's composition of the Payment Agreements and Invoices is all the more arresting. Accordingly, we reach the same conclusion the district court did: Byrne and Rasmussen's Declarations fail competently to tie the Invoices to the Payment Agreements, as collated in Exhibit C, undermining their admissibility as Balboa's business records.

Balboa resists this conclusion by citing *PNC Bank, Nat'l Ass'n v. Ruiz*, which notes that a document can be properly incorporated into a business's records from an external source. No. 22-50584, 2023 WL 3340078, at *3 (5th Cir. 2023) (per curiam) (citing *United States v. Duncan*, 919 F.2d 981, 986 (5th Cir. 1990)). That proposition, which *PNC Bank* sourced from *Duncan*, is sound. *See Duncan*, 919 F.2d at 985–87 (affirming admission of an insurance company's records originally obtained from medical providers). But in *Duncan*, this court highlighted that the medical records "were themselves business records" and that the "primary emphasis of [R]ule 803(6) is on the reliability or trustworthiness of the records sought to be introduced." *Id.* at 986 (quoting *United States v. Veytia–Bravo*, 603 F.2d 1187, 1189 (5th Cir. 1979), *cert. denied*, 444 U.S. 1024 (1980)). *Duncan* further underscored that "[t]he district court has great latitude on the issue of trustworthiness." *Id.*

Measured against that precedent, Exhibit C lacks comparable indicia of reliability. Unlike a hospital's providing medical records to a health insurer, MHT's creation and distribution of the Invoices raise more questions than assurances. MHT's involvement in a Ponzi scheme undermines the trustworthiness of the company's documents, not least

regarding the "source of [the] information." Fed. R. Evid. 803(6)(E). And notwithstanding MHT's dubious activities, the challenged documents are not independently reliable: The Payment Agreements and Invoices are not sequentially Bates numbered—indicating they were not paired in the company's files, or perhaps ever; the Invoices are not marked as "Exhibit 'A1'" so as to tie them to the Payment Agreements; and the Invoices do not otherwise cross-reference the Payment Agreements. Thus, despite the allusions to supplemental documentation in the Payment Agreements, there is no evidence in, or adjacent to, *the Invoices themselves* to show they are that documentation.

At bottom, the Byrne and Rasmussen Declarations essentially state that the Invoices should be admitted as business records because Balboa located them in its business records. That tautological reasoning is insufficient to establish the reliability of Exhibit C, which in turn depends both on the reliability of the Invoices themselves *and* on their interplay with the Payment Agreements. Exhibit C was thus not properly authenticated to meet the business records exception to the rule against hearsay. Therefore, the district court was within its discretion to conclude that the evidence should be stricken.

## B.

Having resolved the antecedent evidentiary issue, we turn to the district court's summary judgment. The Physicians' motions for summary judgment were premised on their argument that there was no binding financing contract between them and Balboa. In the Physicians' view, the Payment Agreements—either considered alone or in conjunction with the Invoices—fail to include material terms. Accordingly, there was no meeting of the minds on the Physicians' repayment obligations to Balboa or on Balboa's method of disbursement to MHT. The district court entered

summary judgment largely because it had stricken the Invoices—and the additional terms they contained—from the summary judgment record. Upon review, we conclude that the Payment Agreements are not enforceable contracts, with or without the Invoices, and thus affirm the district court.

The Payment Agreements stipulate that they shall be governed by California law, and neither side contests these choice of law provisions. Under California law, the existence of a contract requires: "(1) Parties capable of contracting; (2) Their consent; (3) A lawful object; and, (4) A sufficient cause or consideration." CAL. CIV. CODE § 1550. Consent must be free, mutual, and communicated by each to the other. *Id.* § 1565. "Consent is not mutual, unless the parties all agree upon the same thing in the same sense." *Id.* § 1580. Mutual consent is assessed objectively and is "gathered from the reasonable meaning of the words and acts of the parties, and not from their unexpressed intentions or understanding." *Reigelsperger v. Siller*, 150 P.3d 764, 767 (Cal. 2007) (citation omitted).

When ascertaining consent based on the text of an agreement, "a contract involving a loan must include its amount and the terms for repayment." *Reeder v. Specialized Loan Servicing LLC*, 266 Cal. Rptr. 3d 578, 585 (Cal. Ct. App. 2020). More specifically, the "essential terms" of a loan agreement include "the amount of the loan, the rate of interest, the terms of repayment, [and] applicable loan fees and charges." *Kruse v. Bank of Am.*, 248 Cal. Rptr. 217, 230 (Cal. Ct. App. 1988); *accord Westlands Water Dist. v. All Persons Interested*, 313 Cal. Rptr. 3d 1, 24 (Cal. Ct. App. 2023), *as modified*, (Sept. 1, 2023), *review denied*, (Nov. 29, 2023) (emphasis original) (citations omitted) (using "the words 'material' and 'essential' interchangeably" and identifying "subject matter, *price*[,] *payment*, quantity, quality, duration, or the work to be done" as examples of "material term[s]"). "Where a contract is so uncertain and indefinite that the intention of the parties in *material* particulars cannot be ascertained, the contract is void and unenforceable."

*Cal. Lettuce Growers v. Union Sugar Co.*, 289 P.2d 785, 790 (Cal. 1955) (emphasis added).

Here, the Payment Agreements only disclose the duration of the financing and the scheduled payment amounts.  The Payment Agreements do not include the total amount financed or the cost of financing.  Because of these omissions, the precise terms of the parties' supposed agreements remain uncertain.  In such a situation, when "a supposed 'contract' does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract."  *Westlands*, 313 Cal. Rptr. 3d at 24 (citation omitted).  Thus, the Payment Agreements, standing alone, are unenforceable due to the absence of material terms and the corresponding lack of mutual assent, just as the district court concluded.

Balboa contends that the Payment Agreements incorporate the Invoices by reference, so that they might collectively form a complete contract even though the district court did not admit them as such.  This argument is based on California law that "[a] contract may validly include the provisions of a document not physically a part of the basic contract." *Shaw v. Regents of Univ. of California*, 67 Cal. Rptr. 2d 850, 856 (Cal. Ct. App. 1997) (citation omitted).  But assuming *arguendo* that the Payment Agreements incorporated the Invoices by reference, there still would not be a valid contract because each Invoice only reports the cost for a single MHT License.  Neither the Payment Agreements nor the Invoices disclose a total amount financed or a total cost of financing.  So even viewed together, the Payment Agreements and the Invoices fail to constitute an enforceable financing contract under California law.

Because Balboa cannot establish the existence of valid contracts between it and the Physicians, its breach of contract and breach of guarantee

No. 23-10333

claims fail as a matter of law.  The district court correctly granted summary judgment to the Physicians on this basis.

## IV.

For the foregoing reasons, we affirm the district court's order striking Exhibit C from the summary judgment record.  We also affirm the district court's summary judgment in favor of the Physicians.

AFFIRMED.